**TA LEGAL GROUP PLLC**
Taimur Alamgir, Esq.
315 Main Street, Second Floor
Huntington, NY 11743
(914) 552-2669
tim@talegalgroup.com
*Attorneys for Plaintiff Archbishop Russell Davenport,*
*FLSA Collective Plaintiffs, and Class Members*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
RUSSELL DAVENPORT,

               *Plaintiff*,                                **Case No.**

             - against –                   **CLASS AND**
                                        **COLLECTIVE ACTION**
                                        **COMPLAINT**

                                        **Jury Trial Demanded**

EPISCOPAL HEALTH SERVICES, INC.,
ST. JOHN'S EPISCOPAL HOSPITAL
SOUTH SHORE, and ASNEL VALCIN,

               *Defendants*.
-------------------------------------------------------------X

       Plaintiff, Archbishop Russell Davenport ("Plaintiff" or "Archbishop Davenport"), by and

through his undersigned counsel, TA Legal Group PLLC, hereby files this Class and Collective

Action Complaint ("Complaint") against Defendants, Episcopal Health Services, Inc. ("EHS"), St.

John's Episcopal Hospital South Shore ("St. John's"), and Asnel Valcin ("Director Valcin") (EHS,

SJ and Valcin are referred to collectively herein as "Defendants"), and alleges as follows:

1

## INTRODUCTION

1.      Archbishop Davenport has spent a lifetime devoted to his faith and the betterment of his community as a clergyman, public servant, and advocate on behalf of the marginalized and downtrodden.

2.      Defendants treated Archbishop Davenport in a reprehensible and blatantly unlawful manner antithetical to both their identity as an institution affiliated with the Christian faith and public stances against discrimination.

3.      Defendants discriminated against Archbishop Davenport by refusing to permit him to follow his religious precepts and cultural traditions.

4.      Defendants further refused to investigate when Archbishop Davenport complained of sexual harassment (in violation of its codified harassment policies), even after he supported his claim with a sexualized video and hand-drawn art sent to him by the harasser. Instead, Defendants retaliated against Archbishop Davenport for speaking up about discrimination and harassment.

5.      Defendants suspended Archbishop Davenport on the basis of an entirely unsubstantiated claim (in stark contrast to the way his sexual harassment claim was handled). Archbishop Davenport's protected complaint regarding this unlawful conduct was ignored.

6.      Even though Archbishop Davenport was cleared of wrongdoing, Defendants nevertheless told him that it would be terminating his residency on the spot during the very same meeting following a protected complaint.

7.      Archbishop Davenport was fired and dismissed from the Chaplain Residency program by Director Valcin for having the temerity to complain about the outrageous and discriminatory treatment to which he was subjected and about the unlawful actions of Defendants, in direct contravention of their own policies.

8.      In addition, Archbishop Davenport was subject to systematic, class and collective-wide wage-and-hour violations that affected all Chaplain Residents at EHS.

9.      Archbishop Davenport and other Chaplain Residents at EHS were subject to common, unlawful time shaving policies whereby they were forced to work off the clock, resulting in a deprivation of overtime and regular wages.

10.     Archbishop Davenport and other Chaplain Residents are entitled to liquidated damages under NYLL § 191 due to delayed payment of wages.

11.     Archbishop Davenport (and, with respect to the wage and hour claims, prospective class and collective action members) are entitled to substantial damages.

## CLAIMS

12.     Pursuant to 42 U.S.C. § 1981, Archbishop Davenport alleges and seeks to hold Defendants liable for ethnic discrimination, retaliation, and hostile work environment and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

13.     Pursuant to the New York State Human Rights Law, New York State Human Rights Law, New York State Executive Law, Article 15 §§ 290 et seq. ("NYSHRL") Archbishop Davenport alleges and seeks to hold Defendants liable for unlawful ethnic, sex, and religious discrimination, retaliation in response to protected complaints and opposition activity, and hostile work and educational environment, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

14.     Pursuant to the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL") Archbishop Davenport alleges and seeks to hold all

Defendants liable for unlawful ethnic, sex and religious discrimination, retaliation in response to protected complaints and opposition activity, and hostile work and educational environment, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

15.    Pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, Archbishop Davenport alleges and seeks to hold Defendants EHS and St. John's (which operate an educational institution receiving federal funding, subject to the requirements of Title IX) liable for discrimination and harassment on the basis of sex, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

16.    Pursuant to the New York Not-for-Profit Corporations Law ("NPCL") § 715-b, Archbishop Davenport seeks to hold Defendants EHS and St. John's liable for whistleblower retaliation, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

17.    Plaintiff alleges, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., that he and FLSA Collective Members (as defined below) are entitled to recover damages from Defendants for: (1) unpaid overtime wages and (2) liquidated damages.

18.    Plaintiff further alleges, pursuant to the New York Labor Law ("NYLL") and Fed. R. Civ. P. 23, that he and Class Members (as defined below) are entitled to recover damages from Defendants for: (1) unpaid regular and overtime wages, (2) liquidated damages on the unpaid wages, (3) liquidated damages for unlawfully delayed wages pursuant to NYLL § 191, (4) statutory

4

penalties for failing to provide wage notices in compliance with NYLL § 195.1 and (5) statutory penalties for failing to provide wage statements in compliance with NYLL § 195.3,

19.    Plaintiff further alleges that he is entitled to attorney's fees and costs and reserves the right to seek additional damages available under applicable law.

## JURISDICTION, VENUE, AND STATUTORY PREREQUISITES

20.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

21.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

22.    Plaintiff's claims under New York State and New York City law were tolled by the State of New York from March 23, 2020 through November 3, 2020, for 228 days in connection with the state of emergency declared in connection with COVID-19 and Executive Order (A Cuomo) 202.8. and subsequent orders 202.14, 202.28, 202.38, 202.48, 202.55, 202.55.1, 202.60, 202.67, 202.72 [9 NYCRR 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.67, 8.202.72. *Matter of Echevarria v Board of Elections in the City of NY*, 183 A.D.3d 857, 858, 122 N.Y.S.3d 904 [2d Dept, May 21, 2020]).

23.    Defendants engages in an enterprise whose annual volume of sales made or business done is not less than $500,000 and the activities of which affect interstate commerce, in that the employees of Defendants (including Plaintiff) handle goods and materials produced outside of New York that have moved in interstate commerce. Defendants is thus an employer subject to the jurisdiction of the FLSA.

24.    At all relevant times, Plaintiff and Class Members were employed by Defendant within the meaning of the NYLL §§ 2 and 651.

25.    At all relevant times, Defendants EHS and St. John's were and continue to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL and any Regulations thereunder.

26.    At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Defendants.

27.    Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

28.    Collectively, Defendants EHS and St. John's comprise a "single employer" for purposes of all causes of action asserted. Defendants have interrelated operations, centralized human resources and control of labor relations, common senior management, and common ownership and financial control.

29.    EHS holds overall managerial control and operational oversight, and provides human resources services for all of Defendants, including with respect to Archbishop Davenport and his employment.

30.    EHS and St. John's are each New York not-for-profit corporations with more than 20 employees and over $1M in revenue. EHS is the parent company of St. John's.

31.    Defendants EHS and St. John's are each educational institutions that receive federal funding and are party to federal financial assistance programs.

32.    EHS and St. John's as a single integrated enterprise and joint employer with interrelated operations, centralized control of labor relations, common management and common financial control.

33.     Director Valcin is a resident of the state of New York, Director Valcin meets the definition of an employer for purposes of all statutes pursuant to which relief is sought herein. At all relevant times, Director Valcin exercised control over the employment terms and conditions of Plaintiff, FLSA Collective Plaintiffs, and Class Members.

34.     Plaintiff, FLSA Collective Plaintiffs, and Class Members could complain to Director Valcin regarding any of the terms of their employment, and Director Valcin would have the authority to effect any changes to the quality and terms of employees' employment.  Director Valcin had and exercised the power and authority to (i) fire and hire, (ii) determine rate and method of pay, (iii) determine work schedules and (iv) otherwise affect the quality of employment of Plaintiff. Director Valcin was the decisionmaker behind Plaintiff's unlawful discriminatory and retaliatory termination.

## FLSA COLLECTIVE ACTION ALLEGATIONS

35.     Plaintiff brings claims for relief as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of all Chaplain Residents and Supervisors-In-Training employed by Defendants at St. John's Episcopal Hospital South Shore, on or after the date that is six (6) years before the filing of the Complaint in this action ("FLSA Collective Plaintiffs").

36.     At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them overtime wages. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

37.    The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ACTION ALLEGATIONS

38.    Plaintiff seeks relief under Federal Rule of Civil Procedure 23 on behalf of a class consisting   of   all Chaplain Residents and Supervisors-In-Training employed by Defendants at St. John's Episcopal Hospital South Shore on or after the date that is six (6) years before the filing of the Complaint in this action (hereafter "Class" or "Class Members").

39.    Throughout the relevant periods, Plaintiff and Class Members have been similarly situated, sharing substantially similar job requirements, pay provisions, and subjected to Defendants' uniform decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules. This unified treatment resulted in widespread failures, in contravention of the NYLL, to pay Plaintiff and Class Members:

      a.    Regular wages;

      b.    Overtime wages;

      c.    Liquidated damages with respect to unpaid wages;

      d.    Liquidated damages for unlawfully delayed payments under NYLL § 191.

      e.    Failure to provide required wage notices and statements in compliance with NYLL § 195.1 and § 195.3, respectively.

40.    The claims of Plaintiff stated herein are essentially the same as those of Class Members.

41.     Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

42.     The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants there is no doubt that there are more than forty (40) members of the Class. There are similarly more than forty (40) members of the subclass.

43.     Defendants' enterprise-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

44.     Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

45.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against a corporate defendant. Class action treatment will permit a large number of similarly situated

persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

46.     Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs.

47.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

48.     There are questions of law and fact common to the Class which predominate, including:

      a.   What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly.

      b.   At what common rate, or rates subject to common methods of calculation, were and are Defendants required to pay Plaintiff and Class Members for their work;

c.  Whether Defendants failed to compensate Plaintiff and Class Members for all hours worked.

d.  Whether Defendants failed to pay Plaintiff and Class Members overtime pay for hours worked in excess of 40 each week.

e.  Whether Plaintiff and Class Members performed "manual labor" for 25% or more of their working hours.

f.  Whether Plaintiff and Class Members were compensated bi-weekly.

g.  Whether Plaintiff and Class Members are entitled to liquidated damages under NYLL § 191 for delayed payment of wages.

h.  Whether Defendants unlawfully failed to provide Plaintiff and Class Members wage notices in compliance with NYLL § 195.1.

i.  Whether Defendants unlawfully failed to provide Plaintiff and Class Members wage statements in compliance with NYLL §195.3.

## STATEMENT OF FACTS

49.    Archbishop Russell Davenport is an African-American, black male in his 60's, and a proud husband, father, and grandfather.

50.    Archbishop Davenport is Senior Pastor and Founder of the Arrow of Yahweh International Ministries located in Cambria Heights, Queens, NY and the Metropolitan of the Fifth Province of the Holy Communion of Churches, also known as the International Communion of the Holy Christian Orthodox Church ("HCOC"). As Senior Pastor, Archbishop Davenport has delivered and overseen pastoral care to members of his church in Cambria Heights for nearly 2 decades.

51.    The HCOC is an ecumenical Orthodox Catholic Communion of Churches with

4 million members around the world. As per the HCOC's website, www.holycommunionchurches.org, the HCOC "patterns its approach to Christianity after that of the Eastern and Oriental Orthodox Church's while remaining reverent and relevant to the western American culture."

52.    Prior to his association with Defendants, Archbishop Davenport studied at multiple religious institutes of higher learning, earning a doctorate in Sacred Theology from the Christ Theological Seminary in Yonkers, NY. In addition to his doctorate, Archbishop Davenport holds a BS in Organizational Business Management from St. Joseph's College and a Masters of Science in Criminal Justice from Molloy University.

53.    Before his professional and educational involvement with Defendants, Archbishop Davenport developed a lengthy track record of advocacy on behalf of disenfranchised and downtrodden community members, including low-wage workers and the homeless. Archbishop Davenport has been repeatedly recognized for his service to the community, including by the NAACP.

54.    Prior to his professional and educational involvement with Defendants, in additional to his above-described roles as a religious and community leader, Archbishop Davenport spent decades in public service as a law enforcement officer, including as a police officer and as a New York State Police Instructor with the Nassau County Sheriff's Department.

***St. John's and the Clinical Pastoral Education Center and Program***

55.    EHS is a 501(c)(3) not-for-profit corporation that operates a New York-based hospital system, including St. John's. EHS is a part of the Episcopal Diocese of Long Island.

56.    St. John's is a 257-bed teaching hospital located in Far Rockaway, Queens, NY owned and operated by EHS.

12

57.     EHS maintains the Clinical Pastoral Education ("CPE") Center, a component of St. John's, which offers pastoral services to patients and community members.

58.     Pertinently, the CPE center offers a CPE trainee program accredited by the College of Pastoral Supervisory and Psychotherapy, which includes professional training and education for ministry. St John's specifically offers residency and supervisor-in-training programs for individuals seeking training and certification in the field. Similar to other hospital residency programs, residents in the CPE program work as chaplains at St John's while taking classes and receiving training.

59.     Notably, given Defendants' unlawful treatment of Archbishop Davenport, EHS emphasizes the racial, ethnic and cultural diversity of the CPE program.

60.     In this regard, the website for the program states:

> The diversity of our trainees and our supervisors' skills make this program unique and outstanding. [...] EHS facilities service the diverse ethnic, social, and economic community of the Rockaways. We preserve, express and share in this diversity, which harbors potent experiences and lessons in pastoral care for students at this CPE Center.

61.     Likewise, EHS issued an official document stating that the CPE Center "*uses innovative technology to connect faculty and trainees from around the globe to support its mission of 'Excellence in training for compassionate pastoral care'*".

62.     The CPE program also publicly seeks to enroll trainees hailing from diverse ethnic and cultural backgrounds, so that such trainees can advance *"indigenously developed CPE in their own cultural contexts through partnership with the EHS-CPE Program*."

63.     Given Archbishop Davenport's status as an Archbishop, his many years of hands- on pastoral experience, his religious and secular educational credentials, his service as a law enforcement officer, his status and reputation as a widely-respected and admired figure in

13

the community, and his earnest desire to obtain credentials in CPE in order to advance his ministry, capacity, and qualifications to provide spiritual guidance to those in need, Archbishop Davenport was highly qualified for the CPE program.

64.     In approximately February 2022, Archbishop Davenport was hired by Defendants and admitted to the CPE Program as a Chaplain Resident with the objective of achieving certification as a supervisor, which requires the successful completion of 4 units. Due to his superior qualifications, Archbishop Davenport was initially informed that he was being hired as a Supervisor-In-Training. However, Defendants placed him in the Chaplain Resident role, and ultimately denied him promotion and terminated him unlawfully as discussed herein.

65.     For the duration of his residency and employment at St. John's, Archbishop Davenport was supervised by the CPE Program Director, Director Valcin, as well as the CPE Program Training Supervisor, Dr. Francine Hernandez ("Dr. Hernandez").

66.     Archbishop Davenport successfully completed 2 units of the CPE program during 2022. Archbishop Davenport's performance evaluations included overwhelmingly positive comments regarding his performance. The third of 4 units commenced in approximately February 2023.

67.     Archbishop Davenport repeatedly informed his supervisors that he intended to take the full 4 units as supervisory chaplain positions required same as a qualification. Archbishop Davenport applied to complete his 4 units later in 2023 but, as discussed below, renewal was rejected due to discrimination and retaliation for protected complaints.

***Defendants Subjected Archbishop Davenport, FLSA Collective Plaintiffs, and Class Members To Systematic Wage-And-Hour Violations***

68.     Throughout his employment with Defendants, Plaintiff was compensated at a straight time base hourly rate of $20.82.

14

69.     Throughout his employment with Defendants, Plaintiff regularly worked 8-10 hours per day, 5 days per week, for a total of approximately 41-45 hours per week.

70.     Like Plaintiff, FLSA Collective Plaintiffs and Class Members regularly worked in excess of 40 hours per week.

71.     Throughout his employment period, Plaintiff was compensated on a bi-weekly basis. Likewise, FLSA Collective Plaintiffs and Class Members were compensated on a bi-weekly basis.

72.     Throughout his employment period, Plaintiff was not paid for all regular and overtime hours worked. Instead owing to Defendants' unlawful policies and practices, Plaintiff was deprived of regular overtime and regular wages.

73.     Plaintiff and other Chaplain Residents and Supervisors-in-Training were scheduled to work 8-hour shifts (Plaintiff's scheduled shifts including 6am to 2pm, 7am to 3pm, and 8am to 4pm).

74.     However, Plaintiff was required approximately 2-5 times per workweek on average to clock out and continue working past the scheduled end of his shift, sometimes for an hour or more. Throughout his employment period, Plaintiff was not compensated for the time that he was made to work after clocking out at the end of his shift.

75.     Director Valcin openly mandated that Plaintiff and all other Chaplain Residents and Supervisors-In-Training were required to clock out at the scheduled of their shift every day, no matter what, and continue working off the clock thereafter without compensation. Director Valcin openly directed Plaintiff and other Chaplain Residents and Supervisors-In-Training that "**If you can't finish your work in your shift, you have to clock out and then finish your work.**"

76.     Plaintiff was regularly required to continue working off-the-clock past the end of his scheduled shift when called on to counsel the families of patients in traumatic situations (i.e., learning that a loved one would not make it). This was naturally a time-intensive and highly sensitive duty that Plaintiff could not simply "hand off" to another Chaplain at the scheduled end of his shift, given the emotional fragility and vulnerability of the families. Other duties that Plaintiff was required to perform on a regular basis after clocking out included opening the "relaxation room" for employees, counseling employees that experienced traumatic situations, and counseling and assessing patients. Moreover, even once he completed his spiritual and clinical duties, Plaintiff was required to submit documentation ("charting") prior to leaving. Other Chaplain Residents and Supervisors-in-Training were required to remain at work beyond the end of their respective shifts off-the-clock without compensation for purposes of performing similar duties.

77.     Plaintiff and other Chaplain Residents and Supervisors-In-Training complained to Director Valcin that they were not being paid for time worked following the end of scheduled shifts. However, when Plaintiff complained, Director Valcin refused to change the policy and insisted that Plaintiff and all other Chaplain Residents and Supervisors-In-Training were required to clock out at the end of scheduled shifts, even though additional unpaid off-the-clock work was regularly required to be performed thereafter.

78.     On those occasions that Plaintiff and other Chaplain Residents and Supervisors-In-Training clocked out after the scheduled shift end, Defendants would manually manipulate their time records to reflect a clock out at the scheduled shift conclusion.

79.     Defendants' reduction of Plaintiff's compensable time is reflected in Plaintiff's paystubs, which show that Plaintiff was compensated for 75 hours per bi-weekly pay period (37.5

16

hours per week), regardless of the true number of hours that Plaintiff worked.

80.     Due to Defendants' aforesaid common policy of requiring the performance of unpaid, off-the-clock work after the scheduled shift end, Plaintiff was deprived of regular and overtime wages. Likewise, FLSA Collective Plaintiffs and Class Members were deprived of regular and overtime wages due to this universally-applicable, unlawful policy of off-the-clock work.

81.     Throughout his employment period, Plaintiff was subject to a daily 30 minute deduction from his compensation based on a purported lunch break. However, Plaintiff was never permitted to have a free and clear break for lunch, as he remained on call throughout the day and was frequently directed by Defendants to perform pastoral duties (i.e., counseling of families, patients, and employees) and other work tasks during his purported lunch break.

82.     Similarly, other Chaplain Residents and Supervisors-In-Training were also subject to daily 30 minute deductions for a purported lunch break. Like Plaintiff, other Chaplain Residents and Supervisors-In-Training did not receive free and clear lunch breaks and were required to work throughout the day.

83.     Due to the aforementioned policy of deducting 30 minutes from Plaintiff's hours even though Plaintiff was required to work all day, Plaintiff suffered unpaid regular and overtime wages. Similarly, FLSA Collective Plaintiffs and Class Members were deprived of regular and overtime wages due to Defendants' unlawful, commonly-applicable break deduction policy.

84.     Throughout his employment, Plaintiff's daily duties included, without limitation, traveling to meet patients, families and staff members to provide them spiritual and clinical counseling, praying with them (which involves physical contact), conducting worship services and performing religious rites and rituals (for example, the last rites for dying patients,

which involves physical contact). Plaintiff was required to perform the foregoing duties, which constitute "manual labor" for purposes of NYLL § 191, for approximately 50% of each workday.

85.    Class Members' duties similarly included traveling to give spiritual counsel to patients and staff members, conducting worship services, and performing religious rites and rituals. Class Members performed these duties for at least 25% of each workday.

86.    Plaintiff and Class Members were compensated bi-weekly, resulting in delayed payment of wages in violation of NYLL § 191, and are accordingly entitled to liquidated damages.

87.    Plaintiff is also entitled to damages under NYLL § 191 based on Defendants' delayed payment of his wages earned in April and May 2023 until following the end of his unlawful suspension.

88.    Defendants never issued Plaintiff a compliant wage-and-hour notice setting forth his compensation or other information required under NYLL 195.1. Nor did GDT issue Plaintiff proper wage statements in compliance with NYLL 195.3.[1]

89.    Similarly, Class Members were not issued proper wage-and-hour notices or

---

[1] In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the New York State legislature. Defendants' failure to provide such notices trivializes the importance of these notices in protecting Plaintiff's interest in ensuring proper pay. Despite Defendants' conduct, there is a reason why the New York legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See* N.Y. Spons. Mem., 2010 S.B. 8380. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being properly paid. Here, Defendant's failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendant's failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates, and commission payments deprived employees of the ability to contest the pay provided by Defendant, allowed Defendant to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Member's rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Plaintiff and Class Members are therefore entitled to statutory damages.

wage statements.

***Defendants Subjected Archbishop Davenport To Ethnic and Religious Discrimination, Retaliation, and a Hostile Work Environment***

90.      Religious doctrine, ethnic and cultural tradition and customs dictate that, as an Archbishop in the HCOC, Archbishop Davenport wear a yoke, or pastoral collar, while serving in a clerical or ministerial capacity.

91.      Other Chaplains, Chaplain Residents, and Supervisors-In-Training (including, but not limited to, other residents simultaneously enrolled in the CPE program alongside Archbishop Davenport) were permitted to wear clothing while on duty in accordance with their respective religious and cultural customs and traditions.

92.      Archbishop Davenport observed that, consistent with their respective religious and cultural traditions, a female Muslim chaplain of African-American ethnicity was permitted to wear a *hijab,* and that a Jewish chaplain was permitted to wear a *kippah*.

93.      Archbishop Davenport additionally noticed that a Roman Catholic colleague, Father Morado, was permitted to wear a yoke, consistent with his religious and cultural traditions. Trainees from the Roman Catholic Church were similarly permitted to wear their yokes in accordance with their religious and cultural traditions.

94.      Accordingly, from about early February 2023, at the commencement of his third unit of the CPE program, Archbishop Davenport wore his yoke on duty as a Chaplain Resident for Defendants.

95.      Upon observing Archbishop Davenport wearing a yoke while on duty. Director Valcin confronted Archbishop Davenport. Director Valcin publicly admonished Archbishop Davenport for wearing his yoke in accordance with his religious and cultural practices, explicitly admonishing Archbishop Davenport "**You can't wear that around here!**"

19

96.     In response, Archbishop Davenport made a protected complaint to Director Valcin. Archbishop Davenport complained to Director Valcin that wearing his yoke when providing spiritual counsel was his custom based on his religious and cultural traditions. Archbishop Davenport added that wearing his yoke was important given his status as an Archbishop in the HCOC.

97.      Archbishop Davenport further noted to Director Valcin that chaplains of different religions were supposed to be treated equally and that other chaplains, such as the Roman Catholic chaplain, wore yokes and were not subject to admonishment for doing so.

98.     Director Valcin nevertheless ordered Archbishop Davenport to stop wearing the yoke, claiming baselessly that it would cause "confusion."

99.     Despite Archbishop Davenport's protected complaints and requests to be permitted to wear the yoke in accordance with his religious beliefs and ethnic and cultural traditions, Director Valcin admonished Archbishop Davenport not to wear the yoke on repeat occasion.

100.    The refusal to permit Archbishop Davenport to wear his yoke was due to religious and ethnic discrimination.

101.    Director Valcin's unlawful and discriminatory treatment of Archbishop Davenport was noticed by other fellow Chaplains, including Timothy Taylor, who told Archbishop Davenport that he agreed that Director Valcin's refusal to permit Archbishop Davenport to wear his yoke was discriminatory.

### *EHS is Liable For Sex and Gender Discrimination and Sexual Harassment*

102.    EHS's Human Resources Policy and Procedure Manual contains an 11-page "Sexual Harassment" policy provides a detailed set of rules and procedures to be followed in the

event of a sexual harassment claim:

> *All individuals have a right to work in an environment free from any form of discrimination and/ or conduct which can be considered harassing, coercive, or disruptive.*
>
> *[…]*
>
> *Sexual harassment will not be tolerated. It is offensive, a violation of our policies, unlawful, and may subject the Hospital to liability for harm to targets of sexual harassment. Harassers may also be individually subject to liability. Any employee or individual covered by this policy who engages in sexual harassment or retaliation will be subject to remedial and/or disciplinary action (e.g., counseling, suspension, termination).*
>
> *Harassers can be a superior, a subordinate, a coworker or anyone in the workplace including an independent contractor, contract worker, vendor, client, customer or visitor.*

103.    EHS's Sexual Harassment policy further defines "Hostile Environment" as follows:

a.    *Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute "hostile environment" sexual harassment when such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.*

b.    *A sexually harassing hostile work environment includes, but is not limited to, words, signs, jokes, pranks, intimidation or physical violence which are of a sexual nature, or which are directed at an individual because of that individual's sex. Sexual harassment also consists of any unwanted verbal or physical advances, sexually explicit derogatory statements or sexually discriminatory remarks made by someone, which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation, which interfere with the recipient's job performance.*

104.    EHS' Sexual Harassment policy specifically cites the following as examples of sexual harassment:

> *Touching [or] brushing against another employee's body*
>
> *[…]*

21

*Unwanted sexual advances or propositions, such as… [s]ubtle or obvious pressure for unwelcome sexual activities.*

*[…]*

*Sexual or discriminatory displays or publications anywhere in the workplace, such as: Displaying pictures, cartoons, posters, calendars, graffiti, objects, promotional material, reading materials or other materials that are sexually demeaning or pornographic. This includes such sexual displays on workplace computers or cell phones and sharing such displays while in the workplace.*

105.    EHS' Sexual Harassment policy encourages reporting of sexual harassment, and further states, in relevant part, that investigations shall be done in accordance with the following:

*Upon receipt of complaint, the Human Resources Department will conduct an immediate review of the allegations, and take any interim actions (e.g., instructing the respondent to refrain from communications with the complainant), as appropriate.*

*[…]*

*The Hospital will request and review all relevant documents, including all electronic communications.*

*[…]*

*The Hospital will create a written documentation of the investigation (such as a letter, memo or email), which contains the following:*

- *A list of all documents reviewed, along with a detailed summary of relevant documents;*
- *A list of names of those interviewed, along with a detailed summary of their statements;*
- *A timeline of events;*
- *A summary of prior relevant incidents, reported or unreported; and*
- *The basis for the decision and final resolution of the complaint, together with any corrective action(s)*

*[…]*

*The Human Resources Department will promptly notify the individual who reported and the individual(s) about whom the complaint was made of the final determination and implement any corrective actions identified in the written document.*

*[...]*

*The Hospital will inform the individual who reported of the right to file a complaint or charge externally…*

106.    EHS's Sexual Harassment policy also prohibits retaliation against those who report sexual harassment, providing, in pertinent part:

*Unlawful retaliation can be any action that could discourage a worker from coming forward to make or support a sexual harassment claim…. Retaliation may be direct (demotions or terminations), or more subtle (transferred to a less desirable location due to opposing or speaking out against sexual harassment).*

*[…]*

*Such retaliation is unlawful under federal, state, and local law. The state and local laws prohibits employers from retaliating or discriminating in any manner against any person because that person opposed an unlawful discriminatory practice.*

*[…]*

*Even if the alleged harassment does not turn out to rise to the level of a violation of law, the individual is protected from retaliation if the person had a good faith belief that the practices were unlawful. However, the retaliation provision is not intended to protect persons making intentionally false charges of harassment.*

107.    As discussed below, EHS and St. John's utterly failed to follow this policy when Archbishop Davenport made a protected sexual harassment complaint.

108.    During the term starting in fall 2022, Archbishop Davenport was assigned to share a small office at St. John's with a female Chaplain Resident, Chaplain Obiyo. Chaplain Obiyo began making sexual advances towards Archbishop Davenport and engaging in other overtly sexualized conduct in his presence clearly meant to catch his attention.

109.    On or about August 23, 2022, Chaplain Obiyo gave Archbishop Davenport a bizarre "gift" – a sketch with unsubtle sexual connotations:



110.    Upon providing the picture above to Archbishop Davenport Chaplain Obiyo asked Archbishop Davenport in a flirtatious tone, "What do you prefer? **Pussy** or **Doggy**? Chaplain Obiyo's use of sexual innuendo is clear proof of sexual harassment.

111.    Archbishop Davenport requested that Chaplain Obiyo cease her inappropriate behavior. However, Chaplain Obiyo persisted in her sexual harassment of Archbishop Davenport.

112.    On August 31, 2022, Chaplain Obiyo sent Archbishop Davenport a video with a theme similar to her drawing, depicting cats and dogs in eroticized sexual poses and performing sexual acts. A screenshot of the obscene video (which is over a minute long) is below:



113.    Archbishop Davenport understandably viewed aggressive on-the-job sexual advances from another hospital Chaplain on duty to be particularly inappropriate and unseemly.

114.    Archbishop Davenport was shocked by Chaplain Obiyo's sexual innuendo and demonstrably inappropriate conduct, and repeated his request that she stop harassing him. Chaplain Obiyo nevertheless persisted in sexual harassment of Chaplain Davenport.

115.    Archbishop Davenport complained to Chaplain Obiyo, telling her to cease the harassment, but Chaplain Obiyo was undeterred.

116.    Regularly, Chaplain Obiyo moved her chair uncomfortably close to Archbishop Davenport's. Chaplain Obiyo would use her close proximity to bump her chair into Archbishop Davenport's, and to flirtatiously touch and brush up against Archbishop Davenport. When Archbishop Davenport would attempt to shift his chair away, Chaplain Obiyo would bring hers closer in an aggressive effort to initiate sexual contact.

117.    Chaplain Obiyo would also rub Archbishop Davenport's shoulders and legs in an inappropriate and sexual manner on a regular basis. Archbishop Davenport would move away and exhort Chaplain Obiyo to stop, but she persisted in the sexual harassment.

118.    Chaplain Obiyo further made increasingly sexualized and inappropriate comments to Archbishop Davenport.

119.    Chaplain Obiyo's overt sexual aggressiveness to Archbishop Davenport made him extremely uncomfortable.

120.    On December 26, 2022, Archbishop Davenport filed a formal sexual harassment complaint against Chaplain Obiyo with EHS. In connection with this Complaint, Archbishop Davenport provided HR a full explanation of what occurred, and further supplied HR the video and image above.

121.    Defendants took no discernible action in response to Archbishop Davenport's complaint.

122.    Chaplain Obiyo was not suspended from work. Chaplain Obiyo was not even prohibited from entering Archbishop Davenport's office and did so on repeat occasion.

123.    Archbishop Davenport complained on approximately December 29, 2022 to Director Valcin that Chaplain Obiyo was continuing to enter his office despite his serious complaint of sexual harassment. Allowing Chaplain Obiyo to do this violated EHS's sexual harassment policy.

124.    Nevertheless, EHS refused to take any action or restrict Chaplain Obiyo's access to the office.

125.    On February 7, 2023, Chaplain Davenport received the following correspondence from HR:

> Dear Chaplain Davenport:
>
> The investigation into your December 26, 2022 complaint is concluded. Chaplain Obiyo categorically denied all the allegations of unwanted touching and using sexual references in her conversations with you.
>
> There were no witnesses. Accordingly, I was unable to substantiate your complaint. I have forwarded my findings to the Pastoral Care Leadership Team.

126.    Notably, HR believed Chaplain Obiyo's denial based on her say-so.

127.    The February 7 letter shows fails to reference the images that Chaplain Obiyo provided to Archbishop Davenport in the course of the harassment (despite EHS' sexual harassment investigation policies requiring the investigator to review documents provided).

128.    Immediately following receipt of the February 7, 2023 letter closing the investigation based entirely on the harasser's denial, Archbishop Davenport made a protected complaint to HR that the investigation conducted into his complaint of sexual harassment was

inadequate.

129.     In this regard, when Archbishop Davenport asked EHS HR Investigator Billie Lee Whelan how Chaplain Obiyo's "pussy" artwork could be construed as anything other than inappropriate, the investigator replied that Chaplain Obiyo had responded that she "likes to draw". Incredibly, the investigator found Chaplain Obiyo's nonsensical and nonresponsive response to be an adequate explanation for the overt sexual harassment suffered by Archbishop Davenport.

130.     Similarly, when Archbishop Davenport asked Ms. Whelan how the sexualized video could be construed as anything other than sexual harassment, the investigator responded that Chaplain Obiyo had told the investigator that she sent it because she "likes animals".

131.     The foregoing makes it abundantly clear that no legitimate investigation had been conducted, and that EHS's above-quoted policies governing investigations into sexual harassment complaints were not followed. The investigation report also failed to mention the documentary evidence provided, in violation of EHS policies (quoted above).

132.     In making his protected complaint after receiving the letter dated February 7, Archbishop Davenport naturally questioned the integrity of the investigation in view of these outrageous explanations. Remarkably, the investigator advised that Chaplain Obiyo's dubious and frivolous explanations had satisfied her.

133.     As discussed below, Defendants retaliated against Archbishop Davenport for pressing his sexual harassment complaint against Chaplain Obiyo and questioning the validity of their decision to clear her, despite unassailable documentary proof of the harassment.

134.     On or about March 23, 2023, Archbishop Davenport was the subject of a baseless complaint by Stephanie, a file clerk at St. John's

135.     The way in which this unsubstantiated accusation against Archbishop Davenport

was investigated and prosecuted could not be any more different that the cursory investigation of Archbishop Davenport's own well-substantiated complaint.

136.    Archbishop Davenport asked a different file clerk to provide him a census (an entirely routine request). For reasons that are unclear, Stephanie told the other clerk not to comply with Archbishop Davenport's request. Stephanie had previously objected to Archbishop Davenport's requests to perform routine tasks and had treated Archbishop Davenport in a hostile manner.

137.    Archbishop Davenport went to Mr. Francois, Stephanie's supervisor and advised him of the problem. Mr. Francois advised that he would speak to Stephanie. Archbishop Davenport left without once interacting with Stephanie.

138.    Shortly thereafter Director Valcin summoned Archbishop Davenport and all the other chaplains to a meeting. Director Valcin informed Archbishop Davenport in front of the whole group that Stephanie had made a complaint of harassment against Archbishop Davenport. Instead of investigating the matter privately, Director Valcin directed Archbishop Davenport to "explain your actions."

139.    The meeting – which, under EHS's policies, should have been private to ensure the confidentiality of all participants – was made public for the specific purpose of embarrassing and humiliating Archbishop Davenport, due to discrimination and in retaliation for his prior complaints.

140.    Later on March 23, 2023, Director Valcin notified Archbishop Davenport that he was suspended.

141.    On or about March 24, 2023, the next day, Archbishop Davenport submitted a written complaint to Ms. Whelan, copying an attorney. Archbishop Davenport's complaint

28

unequivocally denied wrongdoing.

142.    The March 24, 2023 complaint further made a protected complaint of discrimination and retaliation, contrasting the cavalier and lackadaisical manner in which Archbishop Davenport's complaint was handled, versus the aggressive and intentionally humiliating way in which EHS chose to handle Stephanie's complaint regarding Archbishop Davenport:

> *Due to the way that I have been handled, I feel that this is a retaliatory action on the behalf of St. John's hospital because I in turn filed an SH case against another staff member. When I filed Sexual Harassment against a former employee, she was moved to "work" in another location in the same building and around the corner from me. So much so that she was able to walk back into my office even after I had notified my supervisors that I felt uncomfortable with her in the building. She remained employed for approximately a week. In contrast, I was suspended "the next day". No written information, no nothing. I feel that this action was of a retaliatory nature as well as the process. I feel that I was not allotted a chance to defend myself, nor was I given any form of due process concerning this issue. It is my intent to litigate, and I am forwarding this information to my attorney.*

143.    Archbishop Davenport remained on suspension until the investigation was completed on April 28, 2023.

144.    After failing to communicate with Archbishop Davenport about the investigation for over a month while he was suspended, EHS abruptly summoned Archbishop Davenport for a meeting to discuss the investigation.

145.    Archbishop Davenport had not heard from Defendants for a month and was not available that day. He was never directed to remain in place (as if he were a prisoner) during his suspension. Nevertheless, Archbishop Davenport made himself available promptly.

146.    The meeting was attended by EHS's Chief People Officer, Ms. Gordon and Director Valcin.

147.    During the meeting, Ms. Gordon told Archbishop Davenport that Stephanie's

complaint had been proven to be unmeritorious, based on an interview of her supervisor, Mr. Francois, who backed up Archbishop Davenport's story. Ms. Gordon told Archbishop Davenport that he was being reinstated.

148.    Nevertheless, Ms. Gordon said that Archbishop Davenport would be written up and required to undergo harassment training, citing an anodyne, non-sexual statement by Archbishop Davenport prior to the incident complained of, that Ms. Gordon admitted was outside of the scope of the inquiry.

149.    Specifically, Stephanie had made hostile statements to Archbishop Davenport several months prior (in 2022). Archbishop Davenport politely and respectfully deflected this attack, jokingly saying that Stephanie's hostility was because she "likes me."

150.    Archbishop Davenport complained during the meeting about Defendants failure to follow the proper process with respect to either the sexual harassment complaint that he had made or the meritless and unsubstantiated complaint against him.

151.    Archbishop Davenport further complained his suspension and the dredging up of extraneous issues to find a pretext to punish him, telling Ms. Gordon and Director Valcin that the decision to write him up was "based on falsehoods." Archbishop Davenport vehemently denied any wrongdoing and questioned the integrity of this decision.

152.    In response to this protected complaint, Ms. Gordon and Director Valcin started haranguing Archbishop Davenport, castigating him for not making himself available immediately for the meeting.

153.    In an unmistakable act of retaliation, Director Valcin brought up Archbishop Davenport's residency contract out of nowhere, mere minutes after his protected complaint, and indicated that a forthcoming renewal (normally a formality) would not be granted.

154.    Archbishop Davenport's application for renewal was rejected. When Archbishop Davenport brought up the rejection with Dr. Hernandez following the April meeting during which Archbishop Davenport was reinstated, Dr. Hernandez responded that the program was "full" the following semester.

155.    However, this was not true. Chaplain Kevin and a second Chaplain thereby creating availability. As such, Dr. Hernandez could have easily placed Archbishop Davenport in the class, which would have allowed Archbishop Davenport to complete the full course. EHS's refusal to permit Archbishop Davenport to complete the course was motivated by discrimination and retaliatory animus.

156.    It was brought subsequently to Archbishop Davenport's attention that Stephanie had previously made complaints against male employees that were unsubstantiated. Nevertheless, despite Stephanie's known unreliability and penchant for frivolous complaints against male employees, EHS saw fit to suspend him for over a month.

157.    EHS's hyper-aggressive, "star chamber" treatment of Archbishop Davenport – a month long suspension, finding a pretext to write him up even though the complaint was unsubstantiated, and then denying him a contract renewal (and bringing the refusal to renew up in the meeting regarding Archbishop Davenport's reinstatement, and in direct response to a protected complaint mere minutes prior – contrasts starkly with how the so-called "investigation" into Chaplain Obiyo was handled.

158.    The difference blatantly violated EHS's policies and was due to discrimination and retaliatory animus against Archbishop Davenport for his prior complaints.

159.    Plaintiff engaged TA Legal Group PLLC to represent him, FLSA Collective Plaintiffs, and Class Members, and has agreed to pay the firm a reasonable fee for its services.

## CAUSES OF ACTION

### Count I – Ethnic Discrimination, Retaliation, and Hostile Work Environment Against All Defendants In Violation of 42 U.S.C. § 1981

160.    Plaintiff reincorporates by reference all preceding paragraphs as if set forth herein.

161.    42 U.S.C. § 1981 provides that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

162.    Archbishop Davenport is of African-American descent and therefore a member of an ethnic minority.

163.    Archbishop Davenport was qualified for his position.

164.    Archbishop Davenport was subjected to ethnic discrimination, retaliation, and a hostile work environment by Defendants.

165.    Defendants engaged in discriminatory practices, including treating Archbishop Davenport less favorably than similarly situated employees and students of other ethnicities by refusing to let him wear his yoke in accordance with his ethnic and cultural traditions, and failing to address his complaints of ethnic discrimination.

166.    Defendants retaliated against Archbishop Davenport for engaging in protected activities, including filing complaints and opposing discriminatory practices.

167.    Adverse discriminatory and retaliatory actions taken include unwarranted discipline, suspension and termination under pretext.

168.    Archbishop Davenport experienced harassment and a hostile work environment and other adverse treatment due to his ethnicity.

169.    The harassment was sufficiently severe and pervasive to alter the conditions of employment and create an abusive working environment.

170.    Defendants were responsible for the harassment. Director Valcin and HR condoned and were complicit in fomenting the discrimination, harassment and hostile work environment

171.    As a direct and proximate result of Defendants unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and his ability to support herself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damages to her good reputation, disruption of his personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

172.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

173.    By reason of Defendants discrimination, Plaintiff is entitled to all remedies available for violations of Sec. 1981, including declaratory, injunctive and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

### Count II – Gender, Ethnic, and Religious Discrimination, Retaliation, and Hostile Work and Educational Environment Against All Defendants Under the NYSHRL and NYCHRL

174.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

175.    Defendants have discriminated against Plaintiff in violation of the New York State Human Rights Law by subjecting him to disparate treatment on the basis of his gender, ethnicity,

and religion. Plaintiff has suffered disparate treatment on the basis of his gender, ethnicity, and religion, as a result of Defendants' wrongful conduct.

176.    Archbishop Davenport was subjected to unlawful discrimination, harassment, retaliation, and a hostile work environment due to being a male, his religious affiliation with the HCOC, and his ethnic and cultural practice of wearing a yoke while performing his pastoral duties.

177.    Defendants have discriminated against Plaintiff by treating him differently from and less preferably than similarly-situated employees not of Plaintiff and by subjecting her to severe and pervasive harassment, a hostile work environment, disparate terms and conditions of employment, and other forms of discrimination on the basis of gender, ethnicity, and religion in violation of the law.

178.    Plaintiff repeatedly complained to Defendants and/or Defendants' policymakers about the severe and pervasive discrimination, harassment, hostile work environment and retaliation he was subjected to during employment with Defendants.

179.    Plaintiff notified Defendants of the severe discrimination, sexual harassment, hostile work environment, and retaliation he was subjected to and repeatedly protested to the harassment and discrimination.

180.    Plaintiff's complaints were repeatedly ignored and discouraged by Defendants in accordance with Defendants' policy, practice, and/or custom of discrimination and retaliation.

181.    Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of discrimination, sexual harassment, hostile work environment, and retaliation.

182.    Because he protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment and after termination.

183.    The retaliation substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment.

184.    Defendants knew or should have known about the retaliation and the effect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct.

185.    Director Valcin acted to aid and abet the discrimination and retaliation complained of herein, in violation of the NYSHRL and NYCHRL.

186.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damages to her good reputation, disruption of his personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

187.    The discrimination, hostile work environment, and retaliation that Plaintiff suffered while employed by Defendants severely affected the terms and conditions of his employment.

188.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

189.    By reason of Defendants' discrimination and retaliation, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law as to all Defendants.

190.    Plaintiff shall seek attorney's fees and punitive damages.

## Count III – Gender Discrimination In Violation of Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681-1688) (Defendants EHS and St. John's)

191.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

192.    Defendants EHS and St. John's are operators of an educational institution receiving federal funding.

193.    Defendants EHS and St. John's discriminated against Archbishop Davenport on the basis of sex and subjected him to harassment in violation of Title IX.

194.    Defendants EHS and St. John's possessed actual knowledge of the discrimination and harassment alleged.

195.    Defendants EHS and St. John's displayed deliberate indifference to the discrimination and harassment endured by Plaintiff.

196.    Defendants EHS and St. John's failed to take appropriate action to address the discrimination and harassment, thereby creating a hostile educational environment. Plaintiff seeks declaratory relief affirming that Defendants violated Title IX, injunctive relief to ensure compliance with Title IX, equitable relief as deemed appropriate by the Court, monetary damages, including economic damages, compensatory damages (including emotional distress damages), and punitive damages; and attorneys' fees and costs.

### Count IV – Retaliation In Violation of NPCL § 715(b) (Defendants EHS and St. John's)

197.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

198.    EHS and St. John's are non-for-profit corporations.

199.    EHS and St. John's each have over 20 employees.

200.    EHS and St. John's each have revenue exceeding $1M.

201.    Plaintiff was an employee of EHS and St. John's.

202.    Plaintiff reported, in good faith, actions and/or suspected actions of EHS and St. John's that were illegal, fraudulent, and/or in violation of EHS and St. John's adopted policies.

36

203.     EHS and St. John's failed to adopt, implement, or comply with their whistleblower policies, which protect individuals from retaliation, including intimidation, harassment, discrimination, or adverse employment consequences.

204.     EHS and St. John's instead terminated Plaintiff unlawfully in response to his complaints about their non-compliance with said policies.

205.     Plaintiff seeks declaratory relief affirming that Defendants violated Sec. 715(b), injunctive relief to ensure compliance, equitable relief as deemed appropriate by the Court, monetary damages, including economic damages, compensatory damages (including emotional distress damages), and punitive damages; and attorneys' fees and costs.

**Count V – Collective-Wide Violation of the FLSA (All Defendants)**

206.     At all relevant times, Defendants have been and continue to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

207.     At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

208.     At all relevant times, Defendants had gross annual revenues in excess of $500,000.

209.     At all relevant times, Defendants violated the FLSA because of their policy and practice of failing to pay Plaintiff the full amount of overtime wages.

210.     Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of Defendant. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then

seek leave of Court to amend this Complaint to set forth the precise amount due Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Members for all hours worked, including overtime hours, when Defendants knew or should have known such was due.

211.    Defendant failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

212.    As a direct and proximate result of Defendant's willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

213.    Due to the intentional, willful and unlawful acts of Defendant, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid overtime wages. Plaintiff is entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

**Count VI – Rule 23 Class-Wide Violation of the NYLL (All Defendants)**

214.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Complaint as if fully set forth herein.

215.    At all relevant times, Plaintiff and Class Members were employed by Defendant within the meaning of the NYLL §§ 2 and 651.

216.    Defendant knowingly and willfully failed to pay Plaintiff and Class Members overtime wages in violation of the NYLL.

217.    Defendant knowingly and willfully failed to provide Plaintiff and Class Members with proper wage statements as required under the NYLL.

218.    Defendant knowingly and willfully failed to provide Plaintiff and Class Members with proper wage and hour notices as required under the NYLL.

219.    Defendant knowingly and willfully delayed payment of compensation to Plaintiff, a manual worker, in violation of Sec. 191 of the NYLL.

220.    Due to the Defendant's NYLL violations, Plaintiff and Class Members are entitled to recover from Defendant overtime wages, attorneys' fees and costs, liquidated damages, statutory penalties, costs and disbursements of the action, and interest pursuant to the NYLL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

- A declaratory judgment that the practices complained of herein are unlawful under Title IX, Sec. 1981, NYSHRL, and the NYCHRL, NPCL, the FLSA, and the NYLL,

- An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein.

- Awards of unpaid wages and overtime under the FLSA and NYLL.

- Awards of liquidated damages under the FLSA and NYLL.

- An award of liquidated damages under NYLL Sec. 191 for delayed payments.

- Awards of monetary damages under Title VII, Sec. 1981, NYSHRL, and the NYCHRL, including awards of:

    Economic Damages: Compensation for lost back and front wages, bonuses, benefits, retirement plan losses, and other economic harms resulting from Defendants' discriminatory and retaliatory actions.
    o Compensatory Damages: Compensation for emotional distress, humiliation, and damage to Plaintiff's professional reputation caused by Defendants' conduct.
    o Punitive Damages: Punitive damages to deter Defendants and others from engaging in similar unlawful conduct in the future.

- An award of attorneys' fees and costs and expenses incurred in pursuing the action.

- An award of pre-judgment and post-judgment interests, costs and expenses of

this action together with attorneys' and expert fees and statutory penalties;

- Certification of this matter as a FLSA Collective Action and appointment of Plaintiff as the representative of FLSA Collective Members.

- Certification of this matter as a Rule 23 Class Action and appointment of Plaintiff as the representative of Class Members.

- Any additional relief the Court deems just and proper to remedy the harm caused by Defendants' unlawful actions.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.


Dated:        Huntington, NY
              December 26, 2024

                              Respectfully Submitted,
                              **TA LEGAL GROUP PLLC**
                              *Attorneys for Archbishop Russell Davenport,*
                              *FLSA Collective Plaintiffs, and Class Members*



              By:    _____
                              Taimur Alamgir, Esq.
                              315 Main Street, Second Floor
                              Huntington, NY 11743
                              Tel. (914) 552-2669
                              tim@talegalgroup.com