**TA LEGAL GROUP PLLC**
Taimur Alamgir, Esq.
315 Main Street, Second Floor
Huntington, NY 11743
(914) 552-2669
tim@talegalgroup.com
*Attorneys for Plaintiff Archbishop Russell Davenport,*
*FLSA Collective Plaintiffs, and Class Members*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
RUSSELL DAVENPORT, *on behalf of himself,*
*FLSA Collective Plaintiffs, and Class Members*,

                *Plaintiff*,                            **Case No.**

          - against –                      **FIRST AMENDED**
                                        **CLASS AND**
                                        **COLLECTIVE ACTION**
                                        **COMPLAINT**

                                        **Jury Trial Demanded**

EPISCOPAL HEALTH SERVICES, INC.,
ST. JOHN'S EPISCOPAL HOSPITAL
SOUTH SHORE, and ASNEL VALCIN,

                *Defendants*.
-------------------------------------------------------------X

       Plaintiff, Archbishop Russell Davenport ("Plaintiff" or "Archbishop Davenport"), by and

through his undersigned counsel, TA Legal Group PLLC, hereby files this First Amended Class

and Collective Action Complaint ("FAC") against Defendants, Episcopal Health Services, Inc.

("EHS"), St. John's Episcopal Hospital South Shore ("St. John's"), and Asnel Valcin ("Director

Valcin") (EHS, St. John's and Valcin are referred to collectively herein as "Defendants"), and

alleges as follows:

## INTRODUCTION

1.      Archbishop Davenport has spent a lifetime devoted to his faith and the betterment of his community as a clergyman, public servant, and advocate on behalf of the marginalized and downtrodden.

2.      Defendants treated Archbishop Davenport in a reprehensible and blatantly unlawful manner antithetical to both their identity as an institution affiliated with the Christian faith and public stances against discrimination.

3.      Defendants discriminated against Archbishop Davenport by refusing to permit him to follow his religious precepts and cultural traditions.

4.      Defendants further refused to conduct anything resembling an investigation when Archbishop Davenport complained of sexual harassment (in violation of its codified harassment policies), even after he supported his claim with a sexualized video and hand-drawn art sent to him by the harasser. Instead, Defendants subjected Archbishop Davenport to retaliation and a sustained hostile work environment for speaking up about discrimination and harassment.

5.      Defendants suspended Archbishop Davenport on the basis of an entirely unsubstantiated and frivolous claim (in stark contrast to the way his sexual harassment claim was handled). Archbishop Davenport's protected complaint regarding the sexual harassment he suffered was ignored.

6.      Even though Archbishop Davenport was cleared of wrongdoing, Defendants nevertheless told him that it would be terminating his residency on the spot during the very same meeting following a protected complaint, and then did so.

2

7.      Archbishop Davenport was fired and dismissed from the Chaplain Residency program by Director Valcin for having the temerity to complain about the outrageous and discriminatory treatment to which he was subjected and about the unlawful actions of Defendants, in direct contravention of their own policies.

8.      In addition, Archbishop Davenport was subject to systematic, class and collective-wide wage-and-hour violations that affected all Chaplain Residents at EHS.

9.      Archbishop Davenport and other Chaplain Residents at EHS were subject to common, unlawful time shaving policies whereby they were forced to work off the clock, resulting in a deprivation of overtime and regular wages.

10.     Archbishop Davenport and other Chaplain Residents are entitled to liquidated damages under NYLL § 191 due to delayed payment of wages.

11.     Archbishop Davenport (and, with respect to the wage and hour claims, prospective class and collective action members) are entitled to substantial damages.

## CLAIMS

12.     Pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, Archbishop Davenport alleges and seeks to hold Defendants EHS and St. John's (which operate an educational institution receiving federal funding, subject to the requirements of Title IX) liable for discrimination and harassment on the basis of sex, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

13.     Pursuant to the New York State Human Rights Law, New York State Human Rights Law, New York State Executive Law, Article 15 §§ 290 et seq. ("NYSHRL") Archbishop Davenport alleges and seeks to hold Defendants liable for unlawful sex and religious

discrimination, retaliation in response to protected complaints and opposition activity, and hostile work and educational environment, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

14.     Pursuant to the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL") Archbishop Davenport alleges and seeks to hold all Defendants liable for unlawful sex and religious discrimination, retaliation in response to protected complaints and opposition activity, and hostile work and educational environment, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

15.     Pursuant to the New York Not-for-Profit Corporations Law ("NPCL") § 715-b, Archbishop Davenport seeks to hold Defendants EHS and St. John's liable for whistleblower retaliation, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

16.     Plaintiff alleges, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., that he and FLSA Collective Members (as defined below) are entitled to recover damages from Defendants for: (1) unpaid overtime wages and (2) liquidated damages.

17.     Plaintiff further alleges, pursuant to the New York Labor Law ("NYLL") and Fed. R. Civ. P. 23, that he and Class Members (as defined below) are entitled to recover damages from Defendants for: (1) unpaid regular and overtime wages, (2) liquidated damages on the unpaid wages, (3) liquidated damages for unlawfully delayed wages pursuant to NYLL § 191, (4) statutory

penalties for failing to provide wage notices in compliance with NYLL § 195.1 and (5) statutory penalties for failing to provide wage statements in compliance with NYLL § 195.3,

18.    Plaintiff further alleges that he is entitled to attorney's fees and costs and reserves the right to seek additional damages available under applicable law.

## JURISDICTION, VENUE, AND STATUTORY PREREQUISITES

19.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

20.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

21.    Plaintiff's claims under New York State and New York City law were tolled by the State of New York from March 23, 2020 through November 3, 2020, for 228 days in connection with the state of emergency declared in connection with COVID-19 and Executive Order (A Cuomo) 202.8. and subsequent orders 202.14, 202.28, 202.38, 202.48, 202.55, 202.55.1, 202.60, 202.67, 202.72 [9 NYCRR 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.67, 8.202.72. *Matter of Echevarria v Board of Elections in the City of NY*, 183 A.D.3d 857, 858, 122 N.Y.S.3d 904 [2d Dept, May 21, 2020]).

22.    Defendants engages in an enterprise whose annual volume of sales made or business done is not less than $500,000 and the activities of which affect interstate commerce, in that the employees of Defendants (including Plaintiff) handle goods and materials produced outside of New York that have moved in interstate commerce. Defendants are thus an employer subject to the jurisdiction of the FLSA.

5

23.      At all relevant times, Plaintiff and Class Members were employed by Defendant within the meaning of the NYLL §§ 2 and 651.

24.      At all relevant times, Defendants EHS and St. John's were and continue to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL and any Regulations thereunder.

25.      At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Defendants.

26.      Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

27.      Collectively, Defendants EHS and St. John's comprise a "single employer" for purposes of all causes of action asserted. Defendants have interrelated operations, centralized human resources and control of labor relations, common senior management, and common ownership and financial control.

28.      EHS holds overall managerial control and operational oversight, and provides human resources services for all of Defendants, including with respect to Archbishop Davenport and his employment.

29.      EHS and St. John's are each New York not-for-profit corporations with more than 20 employees and over $1M in revenue. EHS is the parent company of St. John's.

30.      Defendants EHS and St. John's are each educational institutions that receive federal funding and are party to federal financial assistance programs.

31.      EHS and St. John's as a single integrated enterprise and joint employer with interrelated operations, centralized control of labor relations, common management and common financial control.

6

32.     Director Valcin is a resident of the state of New York, Director Valcin meets the definition of an employer for purposes of all statutes pursuant to which relief is sought herein. At all relevant times, Director Valcin exercised control over the employment terms and conditions of Plaintiff, FLSA Collective Plaintiffs, and Class Members.

33.     Plaintiff, FLSA Collective Plaintiffs, and Class Members could complain to Director Valcin regarding any of the terms of their employment, and Director Valcin would have the authority to effect any changes to the quality and terms of employees' employment. Director Valcin had and exercised the power and authority to (i) fire and hire, (ii) determine rate and method of pay, (iii) determine work schedules and (iv) otherwise affect the quality of employment of Plaintiff. Director Valcin was the decisionmaker behind Plaintiff's unlawful discriminatory and retaliatory termination.

## FLSA COLLECTIVE ACTION ALLEGATIONS

34.     Plaintiff brings claims for relief as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of all Chaplain Residents and Supervisors-In-Training employed by Defendants at St. John's Episcopal Hospital South Shore, on or after the date that is six (6) years before the filing of the Complaint in this action ("FLSA Collective Plaintiffs").

35.     At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them overtime wages. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

36.     The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ACTION ALLEGATIONS

37.     Plaintiff seeks relief under Federal Rule of Civil Procedure 23 on behalf of a class consisting   of   all Chaplain Residents and Supervisors-In-Training employed by Defendants at St. John's Episcopal Hospital South Shore on or after the date that is six (6) years before the filing of the Complaint in this action (hereafter "Class" or "Class Members").

38.     Throughout the relevant periods, Plaintiff and Class Members have been similarly situated, sharing substantially similar job requirements, pay provisions, and subjected to Defendants' uniform decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules. This unified treatment resulted in widespread failures, in contravention of the NYLL, to pay Plaintiff and Class Members:

        a.     Regular wages;

        b.     Overtime wages;

        c.     Liquidated damages with respect to unpaid wages;

        d.     Liquidated damages for unlawfully delayed payments under NYLL § 191.

        e.     Failure to provide required wage notices and statements in compliance with NYLL § 195.1 and § 195.3, respectively.

39.     The claims of Plaintiff stated herein are essentially the same as those of Class Members.

40.     Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

41.     The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants there is no doubt that there are more than forty (40) members of the Class. There are similarly more than forty (40) members of the subclass.

42.     Defendants' enterprise-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

43.     Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

44.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against a corporate defendant. Class action treatment will permit a large number of similarly situated

persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

45.    Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs.

46.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

47.    There are questions of law and fact common to the Class which predominate, including:

    a.    What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly.

    b.    At what common rate, or rates subject to common methods of calculation, were and are Defendants required to pay Plaintiff and Class Members for their work;

10

c. Whether Defendants failed to compensate Plaintiff and Class Members for all hours worked.

d. Whether Defendants failed to pay Plaintiff and Class Members overtime pay for hours worked in excess of 40 each week.

e. Whether Plaintiff and Class Members performed "manual labor" for 25% or more of their working hours.

f. Whether Plaintiff and Class Members were compensated bi-weekly.

g. Whether Plaintiff and Class Members are entitled to liquidated damages under NYLL § 191 for delayed payment of wages.

h. Whether Defendants unlawfully failed to provide Plaintiff and Class Members wage notices in compliance with NYLL § 195.1.

i. Whether Defendants unlawfully failed to provide Plaintiff and Class Members wage statements in compliance with NYLL §195.3.

## STATEMENT OF FACTS

48. Archbishop Russell Davenport is an African-American male in his 60's and a proud husband, father, and grandfather.

49. Archbishop Davenport is Senior Pastor and Founder of the Arrow of Yahweh International Ministries located in Cambria Heights, Queens, NY and the Metropolitan of the Fifth Province of the Holy Communion of Churches, also known as the International Communion of the Holy Christian Orthodox Church ("HCOC"). As Senior Pastor, Archbishop Davenport has delivered and overseen pastoral care to members of his church in Cambria Heights for nearly 2 decades.

50. The HCOC is an ecumenical Orthodox Catholic Communion of Churches with

4 million members around the world. As per the HCOC's website, www.holycommunionchurches.org, the HCOC "patterns its approach to Christianity after that of the Eastern and Oriental Orthodox Church's while remaining reverent and relevant to the western American culture."

51.     Prior to his association with Defendants, Archbishop Davenport studied at multiple religious institutes of higher learning, earning a doctorate in Sacred Theology from the Christ Theological Seminary in Yonkers, NY. In addition to his doctorate, Archbishop Davenport holds a BS in Organizational Business Management from St. Joseph's College and a Masters of Science in Criminal Justice from Molloy University.

52.     Before his professional and educational involvement with Defendants, Archbishop Davenport developed a lengthy track record of advocacy on behalf of disenfranchised and downtrodden community members, including low-wage workers and the homeless. Archbishop Davenport has been repeatedly recognized for his service to the community, including by the NAACP.

53.     Prior to his professional and educational involvement with Defendants, in additional to his above-described roles as a religious and community leader, Archbishop Davenport spent decades in public service as a law enforcement officer, including as a police officer and as a New York State Police Instructor with the Nassau County Sheriff's Department.

### *St. John's and the Clinical Pastoral Education Center and Program*

54.     EHS is a 501(c)(3) not-for-profit corporation that operates a New York-based hospital system, including St. John's. EHS is a part of the Episcopal Diocese of Long Island.

55.     St. John's is a 257-bed teaching hospital located in Far Rockaway, Queens, NY owned and operated by EHS.

56.     EHS maintains the Clinical Pastoral Education ("CPE") Center, a component of St. John's, which offers pastoral services to patients and community members.

57.     Pertinently, the CPE center offers a CPE trainee program accredited by the College of Pastoral Supervisory and Psychotherapy, which includes professional training and education for ministry. St John's specifically offers residency and supervisor-in-training programs for individuals seeking training and certification in the field. Similar to other hospital residency programs, residents in the CPE program work as chaplains at St John's while taking classes and receiving training.

58.     Given Archbishop Davenport's status as an Archbishop, his many years of hands- on pastoral experience, his religious and secular educational credentials, his service as a law enforcement officer, his status and reputation as a widely-respected and admired figure in the community, and his earnest desire to obtain credentials in CPE in order to advance his ministry, capacity, and qualifications to provide spiritual guidance to those in need, Archbishop Davenport was highly qualified for the CPE program.

59.     In approximately February 2022, Archbishop Davenport was hired by Defendants and admitted to the CPE Program as a Chaplain Resident with the objective of achieving certification as a supervisor, which requires the successful completion of 4 units.

60.     Due to his superior qualifications, Archbishop Davenport was initially informed that he was being hired as a Supervisor-In-Training. However, Defendants placed him in the Chaplain Resident role, and ultimately denied him promotion for unlawful reasons and terminated him unlawfully as discussed herein.

61.     For the duration of his residency and employment at St. John's, Archbishop Davenport was supervised by the CPE Program Director, Director Valcin, as well as the CPE

Program Training Supervisor, Dr. Francine Hernandez ("Dr. Hernandez").

62.     Archbishop Davenport successfully completed 2 units of the CPE program during 2022. Archbishop Davenport's performance evaluations included overwhelmingly positive comments regarding his performance. The third of 4 units commenced in approximately February 2023.

63.     Archbishop Davenport repeatedly informed his supervisors that he intended to take the full 4 units as supervisory chaplain positions required same as a qualification. Dr. Hernandez even informed Archbishop Davenport that his application would be granted. Archbishop Davenport applied to complete his 4 units later in 2023, but, as discussed below, renewal was rejected due to discrimination, and retaliation for protected complaints.

***Defendants Subjected Archbishop Davenport, FLSA Collective Plaintiffs, and Class Members To Systematic Wage-And-Hour Violations***

64.     Throughout his employment with Defendants, Plaintiff was compensated at a straight time base hourly rate of $20.82.

65.     Throughout his employment with Defendants, Plaintiff regularly worked 8-10 hours per day, 5 days per week, for a total of approximately 41-45 hours per week.

66.     Like Plaintiff, FLSA Collective Plaintiffs and Class Members regularly worked in excess of 40 hours per week. Plaintiff, FLSA Collective Plaintiffs, and Class Members were entitled to overtime for all such work in excess of 40 hours per week, and did not enter into any agreement to the contrary.

67.     Throughout his employment period, Plaintiff was compensated on a bi-weekly basis. Likewise, FLSA Collective Plaintiffs and Class Members were compensated on a bi-weekly basis.

68.     Throughout his employment period, Plaintiff was not paid for all regular and

overtime hours worked. Instead owing to Defendants' unlawful policies and practices, Plaintiff was deprived of overtime and regular wages.

69.    Plaintiff and other Chaplain Residents and Supervisors-in-Training were scheduled to work 8-hour shifts (Plaintiff's scheduled shifts including 6am to 2pm, 7am to 3pm, and 8am to 4pm).

70.    However, Plaintiff was required approximately 2-5 times per workweek on average to clock out and continue working past the scheduled end of his shift, sometimes for an hour or more. Throughout his employment period, Plaintiff was not compensated for the time that he was made to work after clocking out at the end of his shift.

71.    Director Valcin openly mandated that Plaintiff and all other Chaplain Residents and Supervisors-In-Training were required to clock out at the scheduled of their shift every day, no matter what, and continue working off the clock thereafter without compensation. Director Valcin openly directed Plaintiff and other Chaplain Residents and Supervisors-In-Training that **"If you can't finish your work in your shift, you have to clock out and then finish your work."**

72.    Plaintiff was regularly required to continue working off-the-clock past the end of his scheduled shift when called on to counsel the families of patients in traumatic situations (i.e., learning that a loved one would not make it). This was naturally a time-intensive and highly sensitive duty that Plaintiff could not simply "hand off" to another Chaplain at the scheduled end of his shift, given the emotional fragility and vulnerability of the families. Other duties that Plaintiff was required to perform on a regular basis after clocking out included opening the "relaxation room" for employees, counseling employees that experienced traumatic situations, and counseling and assessing patients. Moreover, even once he completed his spiritual and

clinical duties, Plaintiff was required to submit documentation ("charting") prior to leaving. Other Chaplain Residents and Supervisors-in-Training were required to remain at work beyond the end of their respective shifts off-the-clock without compensation for purposes of performing similar duties.

73.    Plaintiff and other Chaplain Residents and Supervisors-In-Training complained to Director Valcin that they were not being paid for time worked following the end of scheduled shifts. However, when Plaintiff complained, Director Valcin refused to change the policy and insisted that Plaintiff and all other Chaplain Residents and Supervisors-In-Training were required to clock out at the end of scheduled shifts, even though additional unpaid off-the-clock work was regularly required to be performed thereafter.

74.    On those occasions that Plaintiff and other Chaplain Residents and Supervisors-In-Training clocked out after the scheduled shift end, Defendants would manually manipulate their time records to reflect a clock out at the scheduled shift conclusion.

75.    Due to Defendants' aforesaid common policy of requiring the performance of unpaid, off-the-clock work after the scheduled shift end, Plaintiff was deprived of regular and overtime wages. Likewise, FLSA Collective Plaintiffs and Class Members were deprived of regular and overtime wages due to this universally-applicable, unlawful policy of off-the-clock work.

76.    Throughout his employment period, Plaintiff was subject to a daily 30 minute deduction from his compensation based on a purported lunch break. However, Plaintiff was never permitted to have a free and clear break for lunch, as he remained on call throughout the day and was frequently directed by Defendants to perform pastoral duties (i.e., counseling of families, patients, and employees) and other work tasks during his purported lunch break.

16

77.     Similarly, other Chaplain Residents and Supervisors-In-Training were also subject to daily 30 minute deductions for a purported lunch break. Like Plaintiff, other Chaplain Residents and Supervisors-In-Training did not receive free and clear lunch breaks and were required to work throughout the day.

78.     Due to the aforementioned policy of deducting 30 minutes from Plaintiff's hours even though Plaintiff was required to work all day, Plaintiff suffered unpaid regular and overtime wages. Similarly, FLSA Collective Plaintiffs and Class Members were deprived of regular and overtime wages due to Defendants' unlawful, commonly-applicable break deduction policy.

79.     Throughout his employment, Plaintiff's daily duties included, without limitation, traveling to meet patients, families and staff members to provide them spiritual and clinical counseling, praying with them (which involves physical contact), conducting worship services and performing religious rites and rituals (for example, the last rites for dying patients, which involves physical contact). Plaintiff was required to perform the foregoing duties, which constitute "manual labor" for purposes of NYLL § 191, for approximately 50% of each workday.

80.     Class Members' duties similarly included traveling to give spiritual counsel to patients and staff members, conducting worship services, and performing religious rites and rituals. Class Members performed these duties for at least 25% of each workday.

81.     Plaintiff and Class Members were compensated bi-weekly, resulting in delayed payment of wages in violation of NYLL § 191, and are accordingly entitled to liquidated damages.

82.     Plaintiff is also entitled to damages under NYLL § 191 based on Defendants' delayed payment of his wages earned in April and May 2023 until following the end of his

unlawful suspension.

83.     Defendants never issued Plaintiff a compliant wage-and-hour notice setting forth his compensation or other information required under NYLL 195.1. Nor did GDT issue Plaintiff proper wage statements in compliance with NYLL 195.3.[1]

84.     Similarly, Class Members were not issued proper wage-and-hour notices or wage statements.

### *Defendants Subjected Archbishop Davenport To Religious Discrimination, Retaliation, and a Hostile Work Environment*

85.     Religious doctrine  and customs dictate that, as an Archbishop in the HCOC, Archbishop Davenport wear a yoke, or pastoral collar, while serving in a clerical or ministerial capacity.

86.     Other Chaplains, Chaplain Residents, and Supervisors-In-Training (including, but not limited to, other residents simultaneously enrolled in the CPE program alongside Archbishop Davenport) were permitted to wear clothing while on duty in accordance with their respective religious traditions.

87.     Archbishop Davenport observed that, consistent with their respective religious

---

[1] In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the New York State legislature. Defendants' failure to provide such notices trivializes the importance of these notices in protecting Plaintiff's interest in ensuring proper pay. Despite Defendants' conduct, there is a reason why the New York legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See* N.Y. Spons. Mem., 2010 S.B. 8380. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being properly paid. Here, Defendant's failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendant's failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates, and commission payments deprived employees of the ability to contest the pay provided by Defendant, allowed Defendant to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Member's rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Plaintiff and Class Members are therefore entitled to statutory damages.

18

traditions, a female Muslim chaplain was permitted to wear a *hijab,* and that a Jewish chaplain was permitted to wear a *kippah*.

88.     Archbishop Davenport additionally noticed that a Roman Catholic colleague, Father Morado, was permitted to wear a yoke, consistent with his religious traditions. Trainees from the Roman Catholic Church were similarly permitted to wear their yokes in accordance with their religious traditions.

89.     Accordingly, from about early February 2023, at or around the commencement of his third unit of the CPE program, Archbishop Davenport wore his yoke on duty as a Chaplain Resident for Defendants.

90.     Upon observing Archbishop Davenport wearing a yoke while on duty. Director Valcin confronted Archbishop Davenport. Director Valcin (who is a Seventh Day Adventist) publicly admonished Archbishop Davenport for wearing his yoke in accordance with his religious and cultural practices, explicitly admonishing Archbishop Davenport "**You can't wear that around here!**"

91.     In response, Archbishop Davenport made a protected complaint to Director Valcin. Archbishop Davenport complained to Director Valcin that wearing his yoke when providing spiritual counsel was based on his religious traditions. Archbishop Davenport added that wearing his yoke was particularly important given his status as an Archbishop in the HCOC.

92.      Archbishop Davenport further noted to Director Valcin that chaplains of different religions were supposed to be treated equally and that other chaplains, such as the Roman Catholic chaplain, wore yokes and were not subject to admonishment or discipline for doing so.

93.     Director Valcin nevertheless ordered Archbishop Davenport to stop wearing the

yoke, claiming baselessly that it would cause "confusion." This explanation is nonsensical and reflects animus towards Archbishop Davenport's faith and denomination, and preference of clerics belonging to other religions and Christian denominations.

94.    Despite Archbishop Davenport's protected complaints and requests to be permitted to wear a yoke in accordance with his religious beliefs and traditions, Director Valcin repeatedly admonished Archbishop Davenport not to wear the yoke – at least 7 or 8 times in February 2023 and March 2023.

95.    Director Valcin's unlawful treatment of Archbishop Davenport was noticed by other fellow Chaplains, including Timothy Taylor, who told Archbishop Davenport that he agreed that Director Valcin's refusal to permit Archbishop Davenport to wear his yoke was discriminatory.

96.    Director Valcin's refusal to permit Archbishop Davenport to wear his yoke demonstrates religious discrimination. Director Valcin held Archbishop Davenport's denomination of Christianity (the HCOC) in low regard relative to his own faith and other religions and Christian denominations.

97.    Additionally, as discussed below, Director Valcin's actions and intentional public humiliation of Archbishop Davenport on repeat occasions for wearing the yoke was deliberate and unlawful retaliation for Archbishop Davenport's recent complaints regarding sexual harassment and sex/gender discrimination.

### *EHS is Liable For Sex and Gender Discrimination and Sexual Harassment*

98.    EHS's Human Resources Policy and Procedure Manual contains an 11-page "Sexual Harassment" policy provides a detailed set of rules and procedures to be followed in the event of a sexual harassment claim:

*All individuals have a right to work in an environment free from any form of discrimination and/ or conduct which can be considered harassing, coercive, or disruptive.*

*[…]*

*Sexual harassment will not be tolerated. It is offensive, a violation of our policies, unlawful, and may subject the Hospital to liability for harm to targets of sexual harassment. Harassers may also be individually subject to liability. Any employee or individual covered by this policy who engages in sexual harassment or retaliation will be subject to remedial and/or disciplinary action (e.g., counseling, suspension, termination).*

*Harassers can be a superior, a subordinate, a coworker or anyone in the workplace including an independent contractor, contract worker, vendor, client, customer or visitor.*

99.    EHS's Sexual Harassment policy further defines "Hostile Environment" as follows:

a.    *Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute "hostile environment" sexual harassment when such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.*

b.    *A sexually harassing hostile work environment includes, but is not limited to, words, signs, jokes, pranks, intimidation or physical violence which are of a sexual nature, or which are directed at an individual because of that individual's sex. Sexual harassment also consists of any unwanted verbal or physical advances, sexually explicit derogatory statements or sexually discriminatory remarks made by someone, which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation, which interfere with the recipient's job performance.*

100.    EHS' Sexual Harassment policy specifically cites the following as examples of sexual harassment:

*Touching [or] brushing against another employee's body*

*[…]*

*Unwanted sexual advances or propositions, such as… [s]ubtle or obvious pressure for unwelcome sexual activities.*

21

[…]

*Sexual or discriminatory displays or publications anywhere in the workplace, such as: Displaying pictures, cartoons, posters, calendars, graffiti, objects, promotional material, reading materials or other materials that are sexually demeaning or pornographic. This includes such sexual displays on workplace computers or cell phones and sharing such displays while in the workplace.*

101.    EHS' Sexual Harassment policy encourages reporting of sexual harassment, and further states, in relevant part, that investigations shall be done in accordance with the following:

*Upon receipt of complaint, the Human Resources Department will conduct an immediate review of the allegations, and take any interim actions (e.g., instructing the respondent to refrain from communications with the complainant), as appropriate.*

*[...]*

*The Hospital will request and review all relevant documents, including all electronic communications.*

*[...]*

*The Hospital will create a written documentation of the investigation (such as a letter, memo or email), which contains the following:*

- *A list of all documents reviewed, along with a detailed summary of relevant documents;*
- *A list of names of those interviewed, along with a detailed summary of their statements;*
- *A timeline of events;*
- *A summary of prior relevant incidents, reported or unreported; and*
- *The basis for the decision and final resolution of the complaint, together with any corrective action(s)*

*[...]*

*The Human Resources Department will promptly notify the individual who reported and the individual(s) about whom the complaint was made of the final determination and implement any corrective actions identified in the written document.*

*[...]*

> *The Hospital will inform the individual who reported of the right to file a complaint or charge externally…*

102.   EHS's Sexual Harassment policy also prohibits retaliation against those who report sexual harassment, providing, in pertinent part:

> *Unlawful retaliation can be any action that could discourage a worker from coming forward to make or support a sexual harassment claim…. Retaliation may be direct (demotions or terminations), or more subtle (transferred to a less desirable location due to opposing or speaking out against sexual harassment).*
>
> *[…]*
>
> *Such retaliation is unlawful under federal, state, and local law. The state and local laws prohibits employers from retaliating or discriminating in any manner against any person because that person opposed an unlawful discriminatory practice.*
>
> *[…]*
>
> *Even if the alleged harassment does not turn out to rise to the level of a violation of law, the individual is protected from retaliation if the person had a good faith belief that the practices were unlawful. However, the retaliation provision is not intended to protect persons making intentionally false charges of harassment.*

103.   As discussed below, EHS and St. John's utterly failed to follow this policy when Archbishop Davenport made a protected sexual harassment complaint.

104.   During the term starting in fall 2022, Archbishop Davenport was assigned to share a small office at St. John's with a female Chaplain Resident, Chaplain Obiyo. Chaplain Obiyo began making sexual advances towards Archbishop Davenport and engaging in other overtly sexualized conduct in his presence clearly meant to catch his attention.

23

105.    On or about August 23, 2022, Chaplain Obiyo gave Archbishop Davenport a bizarre "gift" – a sketch with unsubtle sexual connotations:



106.    Upon providing the picture above to Archbishop Davenport Chaplain Obiyo asked Archbishop Davenport in a flirtatious tone, "What do you prefer? **Pussy** or **Doggy**? Chaplain Obiyo's use of sexual innuendo is clear proof of sexual harassment.

107.    Archbishop Davenport requested that Chaplain Obiyo cease her inappropriate behavior. However, Chaplain Obiyo persisted in her sexual harassment of Archbishop Davenport.

108.    On August 31, 2022, Chaplain Obiyo sent Archbishop Davenport a video with a theme similar to her drawing, depicting cats and dogs in eroticized sexual poses and performing sexual acts. A screenshot of the obscene video (which is over a minute long) is below:



109.     Archbishop Davenport understandably viewed aggressive on-the-job sexual advances and propositions from another hospital Chaplain on duty to be particularly inappropriate and unseemly.

110.     Archbishop Davenport was shocked by Chaplain Obiyo's sexual innuendo and demonstrably inappropriate conduct, and repeated his request that she stop harassing him. Chaplain Obiyo nevertheless persisted in sexual harassment of Chaplain Davenport.

111.     Archbishop Davenport complained to Chaplain Obiyo, telling her to cease the harassment, but Chaplain Obiyo was undeterred.

112.     Regularly, Chaplain Obiyo moved her chair uncomfortably close to Archbishop Davenport's. Chaplain Obiyo would use her close proximity to bump her chair into Archbishop Davenport's, and to flirtatiously touch and brush up against Archbishop Davenport. When Archbishop Davenport would attempt to shift his chair away, Chaplain Obiyo would bring hers closer in an aggressive effort to initiate sexual contact.

113.     Chaplain Obiyo would also rub Archbishop Davenport's shoulders and legs in an inappropriate and sexual manner on a regular basis. Archbishop Davenport would move away and exhort Chaplain Obiyo to stop, but she persisted in the sexual harassment.

114.     Chaplain Obiyo further made increasingly sexualized and inappropriate comments to Archbishop Davenport.

115.     Chaplain Obiyo's overt sexual aggressiveness to Archbishop Davenport made him extremely uncomfortable.

116.     On December 26, 2022, Archbishop Davenport filed a formal sexual harassment complaint against Chaplain Obiyo with EHS. In connection with this protected complaint, Archbishop Davenport provided HR a full explanation of what occurred, and further supplied

HR the video and image above.

117.    Defendants took no discernible action in response to Archbishop Davenport's protected complaint, or to address the hostile work environment created by Chaplain Obiyo.

118.    Chaplain Obiyo was not suspended from work. Chaplain Obiyo was not even prohibited from entering Archbishop Davenport's office and in fact did so on repeat occasion.

119.    Archbishop Davenport complained on approximately December 29, 2022 to Director Valcin that Chaplain Obiyo was continuing to enter his office despite his serious complaint of sexual harassment. Allowing Chaplain Obiyo to do this violated EHS's sexual harassment policy and caused the work environment to remain hostile and permeated with sexual harassment.

120.    Nevertheless, Director Valcin disregarded this protected complaint and refused to take any action or restrict Chaplain Obiyo's access to the office.

121.    On February 7, 2023, Chaplain Davenport received the following correspondence from HR:

> *Dear Chaplain Davenport:*
>
> *The investigation into your December 26, 2022 complaint is concluded. Chaplain Obiyo categorically denied all the allegations of unwanted touching and using sexual references in her conversations with you.*
>
> *There were no witnesses. Accordingly, I was unable to substantiate your complaint. I have forwarded my findings to the Pastoral Care Leadership Team.*

122.    Notably, HR believed Chaplain Obiyo's denial based entirely on her say-so, completely disregarding the evidence provided by Archbishop Davenport.

123.    The February 7 letter shows fails to reference the images that Chaplain Obiyo provided to Archbishop Davenport in the course of the harassment (despite EHS' sexual harassment investigation policies requiring the investigator to review documents provided and

outline them in the report).

124.    In this regard, when Archbishop Davenport asked EHS HR Investigator Billie Lee Whelan how Chaplain Obiyo's "pussy" artwork could be construed as anything other than inappropriate, the investigator replied that Chaplain Obiyo had responded that she "likes to draw". Incredibly, the investigator found Chaplain Obiyo's nonsensical and nonresponsive response to be an adequate explanation for the overt sexual harassment suffered by Archbishop Davenport.

125.    Similarly, when Archbishop Davenport asked Ms. Whelan how the sexualized video could be construed as anything other than sexual harassment, the investigator responded that Chaplain Obiyo had told the investigator that she sent it because she "likes animals".

126.    Remarkably, the investigator advised that Chaplain Obiyo's dubious and frivolous explanations had satisfied her.

127.    The investigator's findings are so obviously erroneous, and the procedure so cursory and contrary to EHS's own policies that bad faith is apparent. The foregoing makes it abundantly clear that no legitimate investigation had been conducted notwithstanding the requirements of the sexual harassment policies.

128.    Moreover, EHS violated its own above-quoted policies governing investigations into sexual harassment complaints. In this regard, even though Archbishop Davenport presented clear evidence that Chaplain Obiyo (1) subjected him to sexual displays and (2) sexual propositions, both of which are **explicitly defined** as sexual harassment in the above-quoted EHS sexual harassment policy. The investigation report also failed to mention or list the documentary evidence provided and reviewed, in violation of EHS policies (quoted above) requiring evidence considered in an investigation to be identified in the investigation report.

129.    Immediately following receipt of the February 7, 2023 letter closing the

investigation based entirely on the harasser's denial, Archbishop Davenport made a protected complaint to HR at EHS that the investigation conducted into his complaint of sexual harassment was   inadequate and contrary to procedure.

130.    In said complaint on or about February 7, 2023, Archbishop Davenport questioned the integrity of the investigation in view of the outrageous explanations offered by Chaplain Obiyo, and the investigator's bewildering deference towards and unquestioning acceptance of Chaplain Obiyo's dubious and self-serving version of events.

131.    Archbishop Davenport then complained of EHS's refusal to properly investigate or address Chaplain Obiyo's clear sexual harassment or the hostile work environment resulting from such conduct, due to discriminatory animus towards him as male. Archbishop Davenport complained, in sum and substance, that EHS rejected and discounted his allegations out of hand because he is a male sexual harassment complainant accusing a woman of sexual harassment. EHS instead took Chaplain Obiyo's word as gospel truth because she is female.

132.    Following Archbishop Davenport's protected complaint on or about February 7, 2023 regarding EHS's illegitimate investigation and the discrimination behind EHS's conclusion, and in response thereto, Defendants began a campaign of retaliation against Archbishop Davenport and subjected him to an increasingly hostile work environment .

133.    As described above, starting in early February 2023, Director Valcin repeatedly and publicly humiliated Archbishop Davenport for wearing his yoke, singling him out for public humiliation and mockery of his collar and religion approximately 7-8 times thereafter (as described above).

134.    As noted, Archbishop Davenport was singled out for harassment and admonishment unlike others who wore collars and other religious garments.

28

135.    Director Valcin's harassment of Archbishop Davenport over the yoke reflected retaliatory animus to the aforementioned protected activity. Temporal proximity is clear Director Valcin started harassing Archbishop Davenport less than 1 month after his sexual harassment complaint in December 2022, and immediately after him subsequent protected complaints to HR on or about February 7, 2023 regarding the inadequacies and bias of the investigation.

136.    As noted herein, Plaintiff served decades as a law enforcement officer. Given his experience, prior to Plaintiff's December 26 and 29, 2022 and February 7, 2023 protected complaints, Director Valcin promised to appoint Plaintiff as liaison to police officers in the hospital (this position would be a significant one as police officers are frequently present at St. John's, including, *inter alia*, where a suspect is injured in the commission of an alleged crime, arrested by the police, and then hospitalized).

137.    However, after the December 2022 complaints, Director Valcin delayed the appointment. Plaintiff asked Director Valcin about the promised police liaison appointment several times in January and February 2023. Director Valcin responded each time that he would facilitate the appointment in a couple of weeks.

138.    Shortly after Plaintiff's February 7, 2023 protected complaint, later that month, Plaintiff once again asked Director Valcin about his progress on the promised police liaison appointment. This time, Director Valcin responded to Plaintiff in a disdainful tone "**We'll see about that.**"

139.    This scornful response signaled rejection. Plaintiff was never appointed to the liaison role.

140.    Director Valcin evidently denied Plaintiff the liaison role – which Plaintiff was eminently qualified for and despite Director Valcin's earlier assurances – in retaliation for Plaintiff's protected complaints.

141.    In late February or early March 2023, Director Valcin further harassed and humiliated Archbishop Davenport by berating him gratuitously in public. Director Valcin yelled to Archbishop Davenport in a mocking and derisive tone "**CHAPLAIN DAVENPORT – WOULD IT HURT TO SMILE? YOU'RE A CHAPLAIN!**"

142.    At the time, Archbishop Davenport had suffered the loss of an immediate family member the day before and was nevertheless at work and performing his duties as Chaplain out of a sense of duty to his employer and the patients, families, and employees in need of his guidance and support.

143.    In retaliation for his protected complaints, Director Valcin chose to single out Plaintiff for public ridicule (other members of the pastoral team were not publicly attacked for not smiling outside of a pastoral setting).

144.    The retaliation against Archbishop Davenport intensified dramatically on March 23, 2023, when Archbishop Davenport was the subject of a baseless complaint by Stephanie, a file clerk at St. John's.

145.    The way in which this unsubstantiated accusation against Archbishop Davenport was investigated and prosecuted could not be any more different that the cursory and bias-tainted investigation of Archbishop Davenport's own well-substantiated complaint.

146.    Archbishop Davenport asked a different file clerk to provide him a census (an entirely routine request). For reasons that are unclear, Stephanie told the other clerk not to comply with Archbishop Davenport's request. Stephanie had previously objected to Archbishop

30

Davenport's requests to perform routine tasks and had treated Archbishop Davenport in a hostile manner.

147.    Archbishop Davenport went to Mr. Francois, Stephanie's supervisor and advised him of the problem. Mr. Francois advised that he would speak to Stephanie. Archbishop Davenport left without once interacting with Stephanie.

148.    Shortly thereafter Director Valcin summoned Archbishop Davenport and all the other chaplains to a meeting. Director Valcin informed Archbishop Davenport in front of the whole group that Stephanie had made a complaint of harassment against Archbishop Davenport. Instead of investigating the matter privately, Director Valcin directed Archbishop Davenport to **"explain your actions."**

149.    The meeting – which, under EHS's policies, should have been private to ensure the confidentiality of all participants – was made public for the specific purpose of embarrassing and humiliating Archbishop Davenport, due to discrimination and in retaliation for his prior complaints.

150.    Later on March 23, 2023, Director Valcin notified Archbishop Davenport that he was suspended.

151.    This suspension was less than 3 months after Archbishop Davenport's December 2022 sexual harassment complaint and only 1.5 months after his complaints in February 2023 regarding the investigation and being barred from wearing his yoke.

152.    On or about March 24, 2023, the next day, Archbishop Davenport submitted a written complaint to Ms. Whelan, copying an attorney. Archbishop Davenport's complaint unequivocally denied wrongdoing.

153.    The March 24, 2023 complaint further made a protected complaint that

discrimination and retaliation were behind the suspension, contrasting the cavalier and lackadaisical manner in which Archbishop Davenport's complaint was handled, versus the aggressive and intentionally humiliating way in which EHS chose to handle Stephanie's complaint regarding Archbishop Davenport:

> *Due to the way that I have been handled, I feel that this is a retaliatory action on the behalf of St. John's hospital because I in turn filed an SH case against another staff member. When I filed Sexual Harassment against a former employee, she was moved to "work" in another location in the same building and around the corner from me. So much so that she was able to walk back into my office even after I had notified my supervisors that I felt uncomfortable with her in the building. She remained employed for approximately a week. In contrast, I was suspended "the next day". No written information, no nothing. I feel that this action was of a retaliatory nature as well as the process. I feel that I was not allotted a chance to defend myself, nor was I given any form of due process concerning this issue. It is my intent to litigate, and I am forwarding this information to my attorney.*

154.    Archbishop Davenport remained on suspension until the investigation was completed on or about April 28, 2023.

155.    After failing to communicate with Archbishop Davenport about the investigation for over a month while he was suspended, EHS abruptly summoned Archbishop Davenport for a meeting to discuss the investigation.

156.    Archbishop Davenport had not heard from Defendants for a month and was not available that day. He was never directed to remain in place (as if he were a prisoner) during his suspension. Nevertheless, Archbishop Davenport made himself available promptly.

157.    The April 28, 2023 meeting was attended by EHS's Chief People Officer, Ms. Gordon and Director Valcin.

158.    During the meeting, Ms. Gordon told Archbishop Davenport that Stephanie's complaint against him had been proven to be unmeritorious, based on an interview of her supervisor, Mr. Francois, who backed up Archbishop Davenport's story. Ms. Gordon told

Archbishop Davenport that he was being reinstated.

159.    Nevertheless, Ms. Gordon said that Archbishop Davenport would be written up and required to undergo harassment training, citing an anodyne, non-sexual statement by Archbishop Davenport prior to the incident complained of, that Ms. Gordon admitted was outside of the scope of the inquiry.

160.    Specifically, Stephanie had made hostile statements to Archbishop Davenport several months prior (in 2022). Archbishop Davenport politely and respectfully deflected this attack, jokingly saying that Stephanie's hostility was because she "likes me." It was brought subsequently to Archbishop Davenport's attention that Stephanie had previously made complaints against male employees that were unsubstantiated. Nevertheless, despite Stephanie's known unreliability and penchant for frivolous complaints against male employees, EHS saw fit to suspend him for over a month and undergo harassment training despite being exonerated.

161.    Archbishop Davenport complained during the meeting about Defendants' failure to follow the proper process with respect to either the sexual harassment complaint that he had made or the meritless and unsubstantiated complaint against him.

162.    Archbishop Davenport further complained his suspension and the dredging up of extraneous issues to find a pretext to punish him, telling Ms. Gordon and Director Valcin that the decision to write him up was "based on falsehoods." Archbishop Davenport vehemently denied any wrongdoing and questioned the integrity of this decision.

163.    In response to this protected complaint, Ms. Gordon and Director Valcin started haranguing Archbishop Davenport, castigating him for not making himself available immediately for the meeting.

164.    In an unmistakable act of retaliation, Director Valcin unilaterally brought up

33

Archbishop Davenport's residency contract out of nowhere during the April 28, 2023 meeting (the purpose of which was to exonerate him), and informed Archbishop Davenport that a forthcoming renewal of his residency contract (normally a formality) would be denied.

165.     Tellingly, Director Valcin's unlawful decision to terminate and deny renewal to Archbishop Davenport occurred **mere minutes** after Archbishop Davenport's protected complaint during the meeting (and approximately 1 month after the March 24, 2023 written complaint). Subsequently, Archbishop Davenport's application for renewal was formally rejected, pursuant to Director Valcin's directive.

166.     When Archbishop Davenport complained to Dr. Hernandez in approximately early May 2023 about the discriminatory non-renewal and termination, Dr. Hernandez responded that the program was "full" the following semester.

167.     However, this was not true. Chaplain Kevin and a second Chaplain withdrew from the program, thereby creating availability. As such, Dr. Hernandez could have easily placed Archbishop Davenport in the class, which would have allowed Archbishop Davenport to continue in the program and complete the full course.

168.     Defendants unlawfully deprived Archbishop Davenport of the opportunity to complete the full 4 unit course even though EHS officials (particularly Dr. Hernandez) had promised (as discussed hereinabove). As a result, Archbishop Davenport was unable to obtain a supervisory certification, a credential required for most chaplain roles.

169.     EHS's refusal to permit Archbishop Davenport to complete the course was motivated by discrimination and retaliatory animus.

170.     EHS's hyper-aggressive, "star chamber" treatment of Archbishop Davenport – a month long suspension, finding a pretext to write him up even though the complaint was

unsubstantiated, and then denying him a contract renewal and terminating him (and doing so in the meeting regarding Archbishop Davenport's reinstatement, and in direct response to a protected complaint mere minutes prior) contrasts starkly with how the so-called "investigation" into Chaplain Obiyo was handled.

171.    The difference blatantly violated EHS's policies and was due to discrimination and retaliatory animus against Archbishop Davenport for his prior complaints.

172.    At the time of his illegal termination on approximately May 18, 2023, Archbishop Davenport informed Director Valcin that he had not received any separation paperwork.

173.    Director Valcin became visibly alarmed by the mention of separation documents. It appeared to dawn on Director Valcin at this moment that his discriminatory, retaliatory, and unlawful treatment and termination of Archbishop Davenport would result in legal liability.

174.    Remarkably, Director Valcin blurted out "**Oh! I have to cover my butt!**"

175.    Director Valcin then implored Archbishop Davenport to sign a separation agreement (in an attempt to "cover his butt" and avoid the consequences of his unlawful conduct by obtaining a release). This panicked, last-minute request for a release further demonstrates that Defendants have no legitimate justification for terminating and taking other adverse actions towards Plaintiff.

176.    Archbishop Davenport declined to sign any release.

177.    Plaintiff engaged TA Legal Group PLLC to represent him, FLSA Collective Plaintiffs, and Class Members, and has agreed to pay the firm a reasonable fee for its services.

## **CAUSES OF ACTION**

### **Count I – Sex/Gender and Religious Discrimination, Retaliation, and Hostile Work and Educational Environment Against All Defendants Under the NYSHRL and NYCHRL**

178.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

179.    Defendants have discriminated against Plaintiff in violation of the New York State Human Rights Law by subjecting him to disparate treatment on the basis of his sex, gender and religion. Plaintiff has suffered disparate treatment on the basis of his sex/gender and religion, as a result of Defendants' wrongful conduct.

180.    Archbishop Davenport was subjected to unlawful discrimination, harassment, retaliation, and a hostile work environment due to being a male, his religious affiliation with the HCOC, and his practice of wearing a yoke while performing his pastoral duties.

181.    Defendants have discriminated against Plaintiff by treating him differently from and less preferably than similarly-situated employees not of Plaintiff and by subjecting her to severe and pervasive harassment, a hostile work environment, disparate terms and conditions of employment, and other forms of discrimination on the basis of sex, gender and religion in violation of the law.

182.    Plaintiff repeatedly complained to Defendants and/or Defendants' policymakers about the severe and pervasive discrimination, harassment, hostile work environment and retaliation he was subjected to during employment with Defendants.

183.    Plaintiff notified Defendants of the severe discrimination, sexual harassment, hostile work environment, and retaliation he was subjected to and repeatedly protested to the harassment and discrimination.

184.   Plaintiff's complaints were repeatedly ignored and discouraged by Defendants in accordance with Defendants' policy, practice, and/or custom of discrimination and retaliation.

185.   Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of discrimination, sexual harassment, hostile work environment, and retaliation.

186.   Because he protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment and after termination.

187.   The retaliation substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment.

188.   Defendants knew or should have known about the retaliation and the effect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct.

189.   Director Valcin acted to aid and abet the discrimination and retaliation complained of herein, in violation of the NYSHRL and NYCHRL.

190.   As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damages to her good reputation, disruption of his personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

191.   The discrimination, hostile work environment, and retaliation that Plaintiff suffered while employed by Defendants severely affected the terms and conditions of his employment.

192.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

193.    By reason of Defendants' discrimination and retaliation, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law as to all Defendants.

194.    Plaintiff shall seek attorney's fees and punitive damages.

**Count II – Gender Discrimination In Violation of Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681-1688) (Defendants EHS and St. John's)**

195.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

196.    Defendants EHS and St. John's are operators of an educational institution receiving federal funding.

197.    Defendants EHS and St. John's discriminated against Archbishop Davenport on the basis of sex and subjected him to harassment in violation of Title IX.

198.    Defendants EHS and St. John's possessed actual knowledge of the discrimination and harassment alleged.

199.    Defendants EHS and St. John's displayed deliberate indifference to the discrimination and harassment endured by Plaintiff.

200.    Defendants EHS and St. John's failed to take appropriate action to address the discrimination and harassment, thereby creating a hostile educational environment. Plaintiff seeks declaratory relief affirming that Defendants violated Title IX, injunctive relief to ensure compliance with Title IX, equitable relief as deemed appropriate by the Court, monetary damages, including economic damages, compensatory damages (including emotional distress damages), and punitive damages; and attorneys' fees and costs.

**Count III – Retaliation In Violation of NPCL § 715(b) (Defendants EHS and St. John's)**

201.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

202.    EHS and St. John's are non-for-profit corporations.

203.    EHS and St. John's each have over 20 employees.

204.    EHS and St. John's each have revenue exceeding $1M.

205.    Plaintiff was an employee of EHS and St. John's.

206.    Plaintiff reported, in good faith, actions and/or suspected actions of EHS and St. John's that were illegal, fraudulent, and/or in violation of EHS and St. John's adopted policies.

207.    EHS and St. John's failed to adopt, implement, or comply with their whistleblower policies, which protect individuals from retaliation, including intimidation, harassment, discrimination, or adverse employment consequences.

208.    EHS and St. John's instead terminated Plaintiff unlawfully in response to his complaints about their non-compliance with said policies.

209.    Plaintiff seeks declaratory relief affirming that Defendants violated Sec. 715(b), injunctive relief to ensure compliance, equitable relief as deemed appropriate by the Court, monetary damages, including economic damages, compensatory damages (including emotional distress damages), and punitive damages; and attorneys' fees and costs.

### Count IV – Collective-Wide Violation of the FLSA (All Defendants)

210.    At all relevant times, Defendants have been and continue to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

211.    At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

212.    At all relevant times, Defendants had gross annual revenues in excess of $500,000.

213.    At all relevant times, Defendants violated the FLSA because of their policy and practice of failing to pay Plaintiff the full amount of overtime wages.

214.    Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of Defendant. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Members for all hours worked, including overtime hours, when Defendants knew or should have known such was due.

215.    Defendant failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

216.    As a direct and proximate result of Defendant's willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

217.    Due to the intentional, willful and unlawful acts of Defendant, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid overtime wages. Plaintiff is entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

**Count V – Rule 23 Class-Wide Violation of the NYLL (All Defendants)**

218.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Complaint as if fully set forth herein.

219.    At all relevant times, Plaintiff and Class Members were employed by Defendant within the meaning of the NYLL §§ 2 and 651.

220.    Defendant knowingly and willfully failed to pay Plaintiff and Class Members overtime wages in violation of the NYLL.

221.    Defendant knowingly and willfully failed to provide Plaintiff and Class Members with proper wage statements as required under the NYLL.

222.    Defendant knowingly and willfully failed to provide Plaintiff and Class Members with proper wage and hour notices as required under the NYLL.

223.    Defendant knowingly and willfully delayed payment of compensation to Plaintiff, a manual worker, in violation of Sec. 191 of the NYLL.

224.    Due to the Defendant's NYLL violations, Plaintiff and Class Members are entitled to recover from Defendant overtime wages, attorneys' fees and costs, liquidated damages, statutory penalties, costs and disbursements of the action, and interest pursuant to the NYLL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

-    A declaratory judgment that the practices complained of herein are unlawful under Title IX, the NYSHRL, and the NYCHRL, NPCL, the FLSA, and the NYLL,

-    An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein.

-    Awards of unpaid wages and overtime under the FLSA and NYLL.

-    Awards of liquidated damages under the FLSA and NYLL.

- An award of liquidated damages under NYLL Sec. 191 for delayed payments.

- Awards of monetary damages under Title IX, the NYSHRL, the NYCHRL, and the NPCL including awards of:

  Economic Damages: Compensation for lost back and front wages, bonuses, benefits, retirement plan losses, and other economic harms resulting from Defendants' discriminatory and retaliatory actions.
  o Compensatory Damages: Compensation for emotional distress, humiliation, and damage to Plaintiff's professional reputation caused by Defendants' conduct.
  o Punitive Damages: Punitive damages to deter Defendants and others from engaging in similar unlawful conduct in the future.

- An award of attorneys' fees and costs and expenses incurred in pursuing the action.

- An award of pre-judgment and post-judgment interests, costs and expenses of this action together with attorneys' and expert fees and statutory penalties;

- Certification of this matter as a FLSA Collective Action and appointment of Plaintiff as the representative of FLSA Collective Members.

- Certification of this matter as a Rule 23 Class Action and appointment of Plaintiff as the representative of Class Members.

- Any additional relief the Court deems just and proper to remedy the harm caused by Defendants' unlawful actions.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated:        Huntington, NY
              May 7, 2025

                        Respectfully Submitted,
                        **TA LEGAL GROUP PLLC**
                        *Attorneys for Archbishop Russell Davenport,*
                        *FLSA Collective Plaintiffs, and Class Members*

              By:    _____
                        Taimur Alamgir, Esq.
                        205 East Main Street, Suite 3-2
                        Huntington, NY 11743
                        Tel. (914) 552-2669
                        tim@talegalgroup.com