UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RUSSELL DAVENPORT,

                    Plaintiff,

          v.

EPISCOPAL HEALTH SERVICES, INC.,
ST. JOHN'S EPISCOPAL HOSPITAL
SOUTH SHORE, AND ASNEL VALCIN,

                    Defendants.

**MEMORANDUM & ORDER**
24-CV-8821 (HG) (CHK)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiff Archbishop Russell Davenport served as a chaplain at St. John's Episcopal Hospital South Shore ("St. John's") as part of the hospital's clinical pastoral education program. But he claims the hospital never paid him for spiritual and clinical counseling that he performed for patients after his shift ended. He separately claims that the hospital improperly rejected his sexual harassment complaint against a fellow chaplain but suspended him when another employee filed a complaint against *him*. In this lawsuit, Plaintiff brings claims under Title IX, the Fair Labor Standards Act ("FLSA"), and various New York statutes against the Episcopal Health Services, Inc. ("EHS"), St. John's, and Asnel Valcin. Defendants move to dismiss. For the following reasons, the motion is GRANTED, the complaint is DISMISSED, and Plaintiff's motion to certify a collective action is DENIED as moot.

# BACKGROUND[1]

Plaintiff is a Black pastor for two churches: the Arrow of Yahweh International Ministries and the Metropolitan of the Fifth Province of the Holy Communion of Churches ("HCOC"). ECF No. 13 ¶¶ 49–50 (Amended Complaint).[2] Defendant EHS is part of the Episcopal Diocese of Long Island. *Id.* ¶ 54. It operates St. John's, a teaching hospital in Queens. *Id.* ¶¶ 54–55. St. John's offers a "Clinical Pastoral Education" ("CPE") program where trainees work as chaplains "while taking classes and receiving training" for "ministry." *Id.* ¶¶ 56–57.

The program admitted Plaintiff in February 2022. *Id.* ¶ 59. Defendants EHS and St. John's informed him that he would be hired as a "Supervisor-In-Training," but ultimately enrolled him as a "Chaplain Resident." *Id.* ¶ 60. Defendant Valcin, the CPE program director, would supervise him. *Id.* ¶ 61. However, Plaintiff could achieve "certification as a supervisor" after completing "4 units" of relevant coursework. *Id.* ¶ 59. As a chaplain resident, Plaintiff (1) provided patients, families, and staff members "spiritual and clinical counseling"; (2) prayed with them; (3) conducted "worship services"; and (4) performed "religious rites and rituals," such as the last rites for dying patients. *Id.* ¶ 79. For this labor, Defendants paid him $20.82 per hour biweekly. *Id.* ¶¶ 64–65, 67.

The complaint makes two objections. The first relates to pay for work allegedly performed after Plaintiff's shift ended. Two to five times each week, employees would counsel

---

[1] The Court "recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).

[2] Unless otherwise indicated, when quoting cases and the parties' papers, the Court omits all internal quotation marks, alteration marks, emphases, footnotes, and citations. The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

"the families of patients in traumatic situations"—for instance, informing them of a patient's terminal illness—even after their eight-hour shift ended. *Id.* ¶ 70–72. The task's sensitive nature precluded "hand[ing] off" a patient to the next chaplain. *Id.* ¶ 71. But supervisor Asnel Valcin asked chaplains to clock out after eight hours and finish their work off the clock. *Id.* ¶ 70. If chaplains clocked out *after* finishing their work, Valcin would edit the time cards to reflect that they had clocked out promptly. *Id.* ¶ 74. Separately, Defendants deducted thirty minutes' pay from each shift for a lunch break. *Id.* ¶ 76. But in practice, EHS chaplains never received a "free and clear" break because they were on-call in case of emergencies. *Id.* ¶¶ 76–77. Finally, Plaintiff alleges that he was compensated bi-weekly and never received "compliant wage-and-hour notice[s]" or "wage statements" under the New York Labor Law. *Id.* ¶ 83.

The second objection claims that Defendants failed to address his sexual harassment complaint. *Id.* ¶ 103. EHS's sexual harassment policies require the hospital to "immediate[ly] review" sexual harassment allegations, investigate and document the complaint, notify the complainant and accused, and take corrective action. *Id.* ¶ 101. In 2022, Plaintiff's female officemate, a fellow chaplain, gave him a sketch of a cat labeled "Pussy" with "sexual connotations," then asked Plaintiff "in a flirtatious tone, 'What do you prefer? Pussy or Doggy?'" *Id.* ¶¶ 104–06. She also sent him a video "depicting cats and dogs in eroticized sexual poses and performing sexual acts." *Id.* ¶ 108. Although Plaintiff told her to stop, she would "touch and brush up" against him and make "inappropriate comments." *Id.* ¶¶ 111–15.

Plaintiff filed a sexual harassment complaint against the female chaplain in December 2022. *Id.* ¶¶ 116. After conducting an investigation, EHS forwarded its findings to the "Pastoral Care Leadership Team" but refused to discipline the chaplain because she denied the allegations and no witnesses supported Plaintiff's claims. *Id.* ¶¶ 117–121. In a later meeting, investigator

3

Billie Lee Whelan explained that the female chaplain shared the sketch and video because she "likes animals" and "likes to draw." *Id.* ¶¶ 124–25.  Finding this dubious, Plaintiff filed a new complaint to EHS's Human Resources Department on February 7, 2023. *Id.* ¶¶ 129, 135.  He accused EHS of failing to investigate his complaints because he was a man. *Id.* ¶¶ 130–31.

Defendants allegedly retaliated. *Id.* ¶ 132.  By way of background, St. John's chaplains generally wore hijabs, kippahs, yokes, and other clothing consistent with their faith in the course of their ministerial duties. *Id.* ¶¶ 87, 88.  But when Plaintiff began wearing a yoke around "early February 2023," Valcin admonished him for doing so because it "would cause confusion"— ostensibly with Roman Catholic trainees who also wore yokes.  *Id.* ¶¶ 88–93.  Valcin denied Plaintiff's repeated requests to do so. *Id.* ¶ 94.  And earlier in the residency program, Valcin had promised to appoint Plaintiff as a "liaison to police officers in the hospital." *Id.* ¶ 136.  But after the discrimination complaint, Valcin stopped mentioning the appointment. *Id.* ¶¶ 137–38. Another time, Valcin yelled at Plaintiff to smile in public. *Id.* ¶ 141.

Tensions came to a head on March 23, 2023, when Plaintiff asked a law clerk to provide him a document.  *Id.* ¶¶ 144, 146.  Hearing this, another clerk told them "not to comply with" the request. *Id.* ¶ 146.  When Plaintiff complained about the incident to the objecting clerk's supervisor, Valcin called him into a meeting with the other chaplains, told Plaintiff that the clerk had filed a harassment complaint against him, asked him to "explain [his] actions," and suspended him that day. *Id.* ¶¶ 148, 150.  Plaintiff submitted a fresh objection to Whelan claiming that the suspension was pretext for "discrimination and retaliation" against his *own* sexual-harassment complaint. *Id.* ¶¶ 152–53.

4

EHS completed its investigation on April 28, 2023, and found the clerk's complaint unmeritorious. *Id.* ¶¶ 154, 158. Ms. Gordon, EHS's Chief People Officer,[3] informed Plaintiff of the result in a meeting with him and Valcin that day. *Id.* ¶ 157. But the hospital nonetheless required Plaintiff "to undergo harassment training" because he had made a joke months earlier that the clerk was hostile to him "because she 'likes [him].'" *Id.* ¶¶ 158–60. Plaintiff complained that punishing him based on this "extraneous issue[]" was "pretext to punish him" for filing his own harassment complaint *Id.* ¶ 162. In response, Ms. Gordon and Valcin turned to "castigat[e]" Plaintiff about arriving promptly to the meeting that day. *Id.* ¶ 163. And Valcin told Plaintiff that EHS would not renew his residency contract. *Id.* ¶ 164. Fulfilling that promise, the CPE program supervisor told Plaintiff that the program was full for the following semester. *Id.* ¶ 166. (Plaintiff alleges that the program was not full. *Id.* ¶ 167.)

Plaintiff sued EHS, St. John's, and Valcin, raising five claims. In Count One, Plaintiff argues that Defendants discriminated and retaliated against him on the basis of sex and religion in violation of the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"). In Count Two, he claims that EHS and St. John's discriminated against him based on sex in violation of Title IX. In Count Three, Plaintiff alleges that EHS and St. John's violated New York's Not-for-Profit Corporation Law ("NPCL") in "terminat[ing] Plaintiff unlawfully" for complaining about hospital policies. *Id.* ¶ 208. In Count Four, Plaintiff claims that Defendants underpaid him in violation of the FLSA. And in Count Five, Plaintiff argues that Defendants violated the New York Labor Law ("NYLL") in failing to pay him timely and provide him adequate wage notices. Plaintiff moves to certify this case as a collective action under the FLSA. ECF No. 23 (Notice of Motion for Conditional Certification).

---

[3]    The complaint does not provide the first name of this individual.

Defendants move to dismiss.  ECF No. 22-1 (Memorandum in Support of Defendants' Motion to Dismiss).  The Court invited the parties to file supplemental briefs to determine whether the ministerial exception precludes Plaintiff's claims, Nov. 13, 2025, Order, which they did.

## LEGAL STANDARD

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although all allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  A court may also grant a motion to dismiss because an affirmative defense ensures that the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Though defenses are normally asserted in an answer, the Court need not wait if the defense "appears on the face of the complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).  But dismissal is appropriate "only if 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'"  *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 150 (2d Cir. 2024).

## DISCUSSION

The ministerial exception bars Plaintiff's Title IX and FLSA claims.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  The Supreme Court interprets that prerogative to "preclude[ the] application of" employment

discrimination laws "to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). As a matter of church government, the rule protects "a religious group's right to shape its own faith and mission through its appointments." *Id.* at 188. As a matter of judicial capacity, "a court is virtually never the place[] to analyze the grounds for a religious group's reasons for selecting its ministers." *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 203 n.26 (2d Cir. 2017).

The exception is "an affirmative defense." *Hosanna-Tabor*, 565 U.S. at 195 n.4. As with any defense, the court may dismiss based on the ministerial exception if its factual predicates clearly appear on the face of the complaint. *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995); *see, e.g.*, *Rweyemamu v. Cote*, 520 F.3d 198, 209–10 (2d Cir. 2008); *Brandenberg v. Greek Orthodox Archdiocese*, No. 20-cv-3809, 2021 WL 2206486, at *8 (S.D.N.Y. June 1, 2021).[4]

The Court may also raise the defense on its own motion. Generally, courts "should not raise *sua sponte* nonjurisdictional defenses." *Acosta v. Cruz*, 221 F.3d 117, 122 (2d Cir. 2000). But courts may invoke such a defense if it "implicates . . . values that may transcend the concerns of the parties to an action." *Femia v. United States*, 47 F.3d 519, 523 (2d Cir. 1995). The ministerial exception implicates such values. Courts understand the exception not only as a defense for parties, but also as a restriction on judges, who "have no warrant to second-guess" a religious institution's personnel decisions. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 759 (2020). And it screens this Court from "taking sides in a religious dispute" and "into excessive entanglement" with church matters. *Rweyemamu*, 520 F.3d at 205. That

---

[4]     The Court declines to take judicial notice of Defendants' websites. For reasons discussed below, the information published on them is not dispositive to the opinion.

structural concern renders the Court's consideration of the doctrine appropriate here.  *See, e.g.*, *Femia*, 47 F.3d at 523 (raising abuse-of-the-writ defense *sua sponte* given judicial economy concerns); *Acosta*, 221 F.3d at 123 (raising statute of limitations *sua sponte* given efficiency concerns).

For the exception to apply, Defendants must show that three elements appear on the face of the complaint.  First, that Plaintiff's claim concerns a religious institution.  Second, that Plaintiff's complaint governs a minister.  And third, that the relevant claims are barred by the exception.  The Court finds that the ministerial exception bars both of Plaintiff's federal claims.

## I.  The Pleadings Clearly Indicate that Defendants' Clinical Pastoral Education Program Is a Religious Institution.

The Supreme Court has not defined the limits of a "religious group."  *See Hosanna-Tabor*, 565 U.S. at 188.  But as a background matter, courts across the country routinely "allow[] hospitals to invoke the ministerial exception doctrine in employment suits from pastoral staff members."  *Penn v. N. Y. Methodist Hosp.*, 884 F.3d 416, 424–25 (2d Cir. 2018) (collecting cases); *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 224 (6th Cir. 2007); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 362 (8th Cir. 1991).  Plaintiff contends that EHS is not a religious group because the complaint "makes no allegations about the religious origins or continuing religious purpose of the hospital."  ECF No. 30 at 5 (Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint).

*Penn v. New York Methodist Hospital* precludes this argument.  There, a chaplain sued a hospital established by the United Methodist Church for employment discrimination and retaliation.  884 F.3d at 421–22.  By the time of suit, the hospital had erased references to the church from its incorporating documents, referred to itself as a "secular institution," and lacked

"a formal relationship with" the church. *Id.* at 418–19. The court still held that the hospital, "because of its history and continuing purpose," was a religious group. *Id.* at 424. It reasoned that the pastoral care department, which "perform[ed] religious rituals" and "conduct[ed] religious services," vested through service a "critical aspect of [its] religious identity." *Id.* at 425. Even though the chaplaincies were "not limited to" Methodists, the "obvious religious characteristics" of the pastoral mission made the hospital a religious group. *Id.* at 424–25.

*Penn* determines this case. Plaintiff's contrary argument starts on its back foot because EHS and St. John's do not disclaim their religious affiliations. It is the opposite: as Plaintiff himself alleges, EHS is "part of the Episcopal Diocese of Long Island" and operates St. John's. ECF No. 13 ¶¶ 54, 55. Both entities hold themselves out to the public as an "Episcopal" hospital or an "Episcopal" health provider. *Id.* at 1. They plainly originate from an established church and serve religious purposes. Therefore, the hospital's secular nature is even *less* pronounced than the one in *Penn*.

Worse still for Plaintiff, EHS's pastoral operations are also marked by clear religious characteristics. Like the Department of Pastoral Care, the CPE program offers "pastoral services to patients and community members." *Id.* ¶ 56. Its chaplains perform religious rituals and rites, worship with patients, and offer spiritual counsel. *Id.* ¶¶ 79–80. The CPE's work therefore also vests in Defendants a critical aspect of its religious entity—even if its services are not strictly Episcopalian. That indisputably religious service renders St. John's and EHS religious groups.

Plaintiff resists this conclusion. He first notes that *Penn*'s holding did not extend to hospitals "secular in their origins and with chaplaincies." 884 F.3d at 426 n.5. But a reasonable decisionmaker reading the complaint could not conclude that the religious purpose of the Clinical Pastoral Education Center in a church operated by "part of the Episcopal Diocese of

Long Island" was secular in its origin or in its chaplaincy.  ECF No. 13 ¶ 54.  Even the dissenting

judge in *Penn* agreed that the NYMH was a religious institution before it "entirely eliminated its

ties with the United Methodist Church."  884 F.3d at 431 (Droney, J., dissenting).

That distinction renders the cases on which Plaintiff relies inapposite.  One involved a

funeral home with "virtually no 'religious characteristics'" and no affiliation "with any church."

*EEOC v. R.G.*, 884 F.3d 560, 582 (6th Cir. 2018).  The other involved a Holocaust remembrance

nonprofit that performed no religious duties and did not hold itself out as a religious institution.

*Lavy v. Am. Soc'y for Yad Vashem*, No. 23-cv-9038, 2024 WL 5465045, at *4 (C.D. Cal. Dec.

19, 2024).  But as the Amended Complaint makes plain, Defendants identify themselves as an

"Episcopal" hospital or "Episcopal" corporation and primarily perform religious duties.  ECF

No. 13 ¶¶ 12, 79.  And though Plaintiff points out that St. John's is a "corporation," he adduces

no evidence that corporate form precludes the ministerial exception.  ECF No. 30 at 6.

## II.    The Pleadings Clearly Indicate that Plaintiff Was a Minister.

The Supreme Court has declined "to adopt a rigid formula for deciding when an

employee qualifies as a minister."  *Hosanna-Tabor*, 565 U.S. at 190.  "What matters, at bottom,

is what an employee does."  *Guadalupe*, 591 U.S. at 753.  Among the probative factors, courts

consider "[1] the formal title given . . . by the Church, [2] the substance reflected in that title,

[3] h[is] own use of that title, and [4] the important religious functions []he performed for the

Church."  *Fratello*, 863 F.3d at 204.  Also relevant is whether the employee's position "reflected

a significant degree of religious training" and "a formal process of commissioning."  *Hosanna-*

*Tabor*, 565 U.S. at 191.  But the absence of any single factor is not fatal.  *Guadalupe*, 591 U.S. at

753.  Plaintiff argues that members of the Clinical Pastoral Program are not ministers, because he

performed certain secular tasks like non-spiritual counseling.  ECF No. 30 at 7.

Again, *Penn* precludes this Court from cobbling the factors together in that way. There, the Department of Pastoral Care hired chaplains from various faiths to "minister to patients, their families, and staff"; facilitate "rituals and practices" consistent with patients' faith traditions; "counsel patients and families" who struggled with their faith when making sensitive medical decisions; "offer prayer, ritual, and devotional materials"; and coordinate chapel services. 884 F.3d at 420. Because the chaplains "provide[d] religious care to the hospital's patients and religious care only," the court applied the ministerial exception. *Id.* at 424.

So too here. EHS's Clinical Pastoral Education program hired chaplains from various faiths to provide spiritual counseling to patients, families, and staff members; pray with them; and perform "religious rites and rituals." ECF No. 13 ¶ 79. By primarily offering "pastoral services to patients and community members," *id.* ¶ 56, Plaintiff served as a minister. This conclusion accords with the relevant factors in *Hosanna-Tabor*. By hiring Plaintiff as a "Chaplain Resident," *id.* ¶ 59, the CPE distinguished him as a religious leader, *see Hosanna-Tabor*, 565 U.S. at 191. Plaintiff's admission into the program reflected a "significant degree of religious training," *id.*, including his "status as an Archbishop" and his "years of hands-on pastoral experience," ECF No. 13 ¶ 58. He held himself out as a minister by attempting to wear a yoke "while serving in a clerical" role. *Id.* ¶ 85. And his job duties effected an Episcopal hospital's mission of providing spiritual counseling for patients, families, and employees. *Id.* ¶ 79. Because those factors led the *Hosanna-Tabor* Court to conclude that a teacher was a minister of her church, they lead this Court to conclude that a chaplain served as a minister too.

Plaintiff resists this conclusion. First, he notes that the chaplain in *Penn* performed "religious care only," 884 F.3d at 424, while he performed both secular and religious tasks. ECF No. 30 at 7. But we need not read that decision so narrowly. The Supreme Court in *Hosanna-*

11

*Tabor* recognized that a teacher who taught a religion class for "only 45 minutes of each workday" could serve as a minister. *Id.* at 193. That makes sense: the Court doubted whether any ministers—even the heads of congregations—performed *zero* secular duties. *Id.* For the same reason, the Court declines to place "too much emphasis on [a minister]'s performance of secular duties" by requiring a chaplain to provide *only* faith-based counseling. *Id.*

Plaintiff next distinguishes *Penn* on grounds that he did not perform "indisputably religious tasks" such as "distributing Bibles or performing Easter communion." ECF No. 30 at 12. But as explained *supra*, the complaint plainly notes that Plaintiff's "daily duties" did include such tasks. ECF No. 13 ¶ 79. Plaintiff does not explain why handing out Bibles and giving communion were dispositive in *Penn* and fatal here. It should be the opposite: courts "ha[ve] no warrant to second-guess" the spiritual nature of Plaintiff's duties by privileging certain rites as more ministerial than others. *Guadalupe*, 591 U.S. at 759–60.

Third, Plaintiff points out that he is not a Methodist—a distinction doubly foreclosed. The Supreme Court in *Guadalupe* rejected the argument that an employee must be a "'practicing' member of" a religion for the ministerial exception to apply. 591 U.S. at 761. It reasoned that deciding whether a minister is a sufficient "co-religionist" to warrant First Amendment protection "would risk judicial entanglement in religious" doctrine. *Id.* Same in *Penn*, where the ministerial exception applied to a Methodist hospital with non-Methodist chaplains. 884 F.3d at 425–26. Both precedents bar this Court from finding Plaintiff's own faith dispositive.

The cases on which Plaintiff relies are inapposite. Each involves employees who possessed no "religious responsibilities." *Trotter v. United Lutheran Seminary*, No. 20-cv-570, 2021 WL 3271233, at *4 (E.D. Pa. July 30, 2021) (pastor who "oversaw" others who performed

religious duties but did not perform those duties herself not a minister); *DeWeese-Boyd v. Gordon Coll.*, 163 N.E.3d 1000, 1013–14 (Mass. 2021) (professor who "integrat[ed] a Christian perspective" into her teaching but did not teach religious doctrine or lead religious exercises not a minister); *Senal v. Lynch*, No. 809730-2021E, 2022 WL 20476312, at *5 (Sup Ct. N.Y. July 8, 2022) (medical transportation coordinator not a minister).  None involves an employee who performed "religious rites and rituals" and offered "spiritual guidance to those in need."  ECF No. 13 ¶¶ 58, 79.  The remaining case declined to apply the exception to a teacher who taught only "one hour of Bible study per day."  *Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 214 (E.D.N.Y. 2006).  By predating *Hosanna-Tabor*, that decision is uninstructive here.

Finally, Plaintiff insists that the ministerial exception does not apply to students.  But he adduces no authority why the exception excludes those who administer religious services simply because they obtain "professional training and education for ministry" part-time.  *Id.* ¶ 57.  The complaint confirms this point by alleging *both* employment-discrimination and education-discrimination claims.  ECF No. 13 ¶¶ 197, 210.  And Plaintiff's proposed line would force the Court to answer "how a minister should conduct religious services or provide spiritual support" in delineating those qualified to minister and those still learning—precisely what the exception aims to bar.  *Penn*, 884 F.3d at 428.  The opinion Plaintiff cites, which declined to extend the exception to "intentional interference with contractual relations" in a dispute between "separate and autonomous" organizations, is too distinct to persuade.  *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 304 F. Supp. 3d 514, 517, 525 (N.D. Miss. 2018).

III.   **The Ministerial Exception Bars Plaintiff's Title IX and FLSA Claims.**

The Court next determines whether the exception bars all or only some of Plaintiff's

employment-discrimination and wage-and-hour claims.  Both federal claims are barred.

A.   *Title IX*

This Circuit's caselaw for determining which claims fall within the scope of the

ministerial exception is "somewhat unsettled."  *Brandenburg*, 2021 WL 2206486, at *4.  On one

hand, the Second Circuit has once set out a functional approach:  the exception does not apply if

it "involves a limited inquiry that, 'combined with the ability of the district court to control

discovery, can prevent a wide-ranging intrusion into sensitive religious matters.'"  *Rweyemamu*,

520 F.3d at 207.  That algorithm reflects an understanding of the exception that forbids

"excessive government entanglement with religion."  *Id.* at 208 (quoting *Lemon v. Kurtzman*,

403 U.S. 602, 613 (1971)).  *But see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534–36

(2022) (explaining that Supreme Court "long ago abandoned *Lemon*").  At the same time, the

Second Circuit has understood the Supreme Court's more recent First Amendment jurisprudence

to "flatly bar[]" ministers "from bringing employment-discrimination claims against the religious

groups that employ" them.  *Fratello*, 863 F.3d at 202–03.  And the Supreme Court rested on a

separate justification for the ministerial exception:  that even "valid and neutral" laws posing no

threat to dogma may not apply to "an internal church decision that affects the faith and mission

of the church itself."  *Hosanna-Tabor*, 565 U.S. at 190.  Indeed, the Ninth Circuit overruled in

part the case on which *Rweyemamu* relied and held that the ministerial exception applies even

when the church does not justify its conduct on unreviewable religious grounds.  *Markel v.

Union of Orthodox Jewish Congregations*, 124 F.4th 796, 811 (9th Cir. 2024).  At the same time,

this Circuit has not overruled *Rweyemamu*, and the Second Circuit in *Penn* assessed whether a Title VII claim risked "government entanglement with religion."  884 F.3d at 427.[5]

The upshot is this:  *Rweyemamu* remains good law and the doctrine appears uncertain, but what is certain is that courts treat employment discrimination claims with "special solicitude."  *Turman v. Abyssinian Baptist Church*, No. 23-cv-11304, 2025 WL 965855, at *6 (S.D.N.Y. Mar. 31, 2025); *see Brandenburg v. Green Orthodox Archdiocese*, No. 20-cv-3809, 2023 WL 2185827, at *8 (S.D.N.Y. Feb. 23, 2023).  In this realm, the exception's two reasons harmonize.  As a remedial matter, a judgment would disrupt a church's "authority to select, supervise," and "remove a minister without interference."  *Guadalupe*, 591 U.S. at 747. Damages may require "a church to accept or retain an unwanted minister, or punish[] a church for failing to do so."  *Hosanna-Tabor*, 565 U.S. at 706.  As an inquisitorial matter, the exception might empower courts to assess "the grounds for a religious group's reasons for selecting its ministers."  *Penn*, 884 F.3d at 427 (quoting *Fratello*, 863 F.3d at 204); *Cath. High Sch. Ass'n of Archdiocese of N.Y. v. Culvert*, 753 F.2d 1161, 1168 (2d Cir. 1985).  Unifying these employment-discrimination precedents, courts in this Circuit have "flatly bar[red]" ministers from bringing employment-discrimination claims relating to tangible employment actions such as "hiring, firing, promoting, deciding compensation, job assignments, and the like."  *Brandenburg*, 2021 WL 2206486, at *4 (quoting *Fratello*, 863 F.3d at 202–03); *Turman*, 2025 WL 965855, at *4.

This rule bars Plaintiff's Title IX retaliation and sex discrimination claims.  Recall that he forwards three theories.  First, that Defendants retaliated against his sex-discrimination

---

[5]    While Plaintiff argues that *Brandenburg* requires the Court to apply this test, that case is inapposite.  There, the Court "need not and d[id] not" decide whether the categorical approach applied because the parties stipulated to it.  2023 WL 2185827, at *9.

complaint by suspending him and then refusing to renew his residency contract when a clerk filed a complaint against him.  ECF No. 22-5 at 12 (Memorandum of Law in Opposition to Defendants' Motion to Dismiss).  Second, that Defendants retaliated against his complaint by barring him from wearing a yoke and denying him a police liaison appointment.  *See id.* at 13–16.  Third, that Defendants discriminated against him based on sex by treating his harassment complaint against a female chaplain as less worthy than a female clerk's complaint against him. *Id.* at 12.

The first two plainly implicate a religious organization's tangible employment actions taken against ministers.  *Fratello*, 863 F.3d at 198.  As a matter of remedy, a judgment would penalize EHS or St. John's for how they selected their chaplains, assigned them job duties at the hospital, or expressed their faith while serving as spiritual counselors.  As a matter of inquiry, the theory that Defendants barred Plaintiff from wearing a yoke because it would "cause confusion" with a "Roman Catholic colleague," ECF No. 13 ¶¶ 88, 93, retaliatory or not, would force the Court to preempt the hospital's "governance and internal organization" insofar as it regulated how its ministers expressed their faith, *Rweyemamu*, 520 F.3d at 208.  Therefore, a damages award would punish the termination of an unwanted chaplain.  *Hosanna-Tabor*, 565 U.S. at 194.[6]

---

[6]     Plaintiff separately alleges that Defendant Valcin retaliated against him by yelling "Would it hurt to smile?" at him weeks after he accused Defendants of rejecting his sexual-harassment complaint because of his sex.  ECF No. 13 ¶¶ 131, 141.  While that statement might not comprise a tangible employment action, Plaintiff simply fails to state a *prima facie* claim for relief on the merits as to this action.  A *prima facie* claim requires evidence of an adverse action. *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).  The Court declines to find a single statement sufficiently adverse to give rise to a Title IX retaliation claim. *Cf. Nahar v. ADR Ventures WPR LLC*, No. 23-cv-3835, 2024 WL 4042433, at *4 (S.D.N.Y. Sept. 3, 2024) (collecting cases in Title VII context).

While closer, the exception also preempts Plaintiff's sex-discrimination claims. Plaintiff seeks relief based on "differences inherent between the . . . improper investigation" against him, and the "investigation conducted in respect to [the female] Chaplain." ECF No. 22-5 at 12. For that reason, the complaint alleges that Whelan failed to *also* "suspend[]" the chaplain (or reassign her to another office) after receiving Plaintiff's sexual-harassment complaint. ECF No. 13 ¶ 118.[7] But this position—that Defendants failed to also suspend the female chaplain—intrudes upon Defendants' authority "to select and control who will minister to the faithful," because it involves the religious group's selection and coordination of chaplains. *Hosanna-Tabor*, 565 U.S. at 194–95. Accordingly, Plaintiff's bank-shot argument intrudes upon church prerogatives.[8]

*Penn* is again instructive. There, a chaplain requested a promotion to "full-time Staff Chaplain," but was passed over. 884 F.3d at 421. After he filed an EEOC complaint, the hospital fired him in part for his performance and in part for making "sexually inappropriate comments to" a female chaplain. *Id.* at 422. The court held that adjudicating the chaplain's Title VII claims would force the court to examine the authenticity of the hospital's firing decision—much of which involved his religious competence, but some of which involved "complaints about sexual harassment from a Resident Chaplain." *Id.* at 428. The Court reasoned that such an inquiry would "plunge [the Court] into a maelstrom of Church policy" and risk "government involvement in . . . ecclesiastical decisions." *Id.* So too here with the female chaplain.

---

[7]     It appears that Defendants may have re-assigned the accused chaplain to another office. The Amended Complaint first alleges that Plaintiff was "assigned to share a small office" with her, ECF No. 13 ¶ 104, but later alleges that she was not "prohibited from entering Archbishop Davenport's office," *id.* ¶ 118.

[8]     The Court takes no position on whether the exception bars sexual harassment suits that do not implicate tangible employment actions, such as hostile-environment claims.

The Court therefore need not decide Plaintiff's contention that the ministerial exception does not bar his hostile work environment claims.   Neither the Supreme Court nor the Second Circuit has decided whether such claims fall within the ministerial exception's ambit.   *See Brandenburg*, 2023 WL 2185827, at *8.   But Plaintiff abandoned this claim under federal law. His memorandum argues only that Valcin surpasses the threshold "for hostile work environment [claims] under the NYSHRL and NYCHRL."   ECF No. 22-5 at 6, 11.   And he articulates the relaxed standard for such claims under state law.   *Id.*   By failing to present or even mention the federal hostile-work-environment standard in his opposition to Defendants' motion to dismiss, Plaintiff has abandoned that theory.   *Aghaeepour v. N. Leasing Sys., Inc.*, No. 14-cv-5449, 2015 WL 7758894, at *10 (S.D.N.Y. Dec. 1, 2015); *Youmans v. Schriro*, No. 12-cv-3690, 2013 WL 6284422, at *5 (S.D.N.Y. Dec. 3, 2013).

It is true, as Plaintiff notes, that his claims involve Title IX and not Title VII.   But the Court declines to elevate the form of his claim over the substance of his theory of the case.   The exception targets "the selection of the individuals who play certain key roles," not whether they are part-time students.   *Guadalupe*, 591 U.S. at 746.   To the extent Plaintiff sues to regulate how St. John's selected and managed its ministers, their continued education is not probative here.

### B.    FLSA

The ministerial exception also bars Plaintiff's FLSA claims relating to underpayment for his performing "pastoral duties" during his lunch break and after his shift ended.   ECF No. 13 ¶¶ 72, 76.   The Second Circuit has not decided whether wage-and-hour claims fall within the First Amendment's reach.   Other courts of appeals facing the question have held that they may— at least when the suit involves salary for ministerial duty.   *Markel*, 124 F.4th 796 at 802, 804; *McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir. 1972); *Shaliehsabou v. Hebrew*

18

*Home of Greater Wash., Inc.*, 363 F.3d 299, 307 (4th Cir. 2004); *Schleicher v. Salvation Army*, 518 F.3d 472, 476–77 (7th Cir. 2008); *Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238, 1246 (10th Cir. 2010); *see also Shukla v. Sharma*, No. 7-cv-2972, 2009 WL 10690810, *3 (E.D.N.Y. Aug. 21, 2009).[9]  Plaintiff contends that he engaged in "commercial activities" outside the exception's reach.  ECF No. 30 at 16.

The ministerial exception applies to Plaintiff's wage-and-hour claims.  Just "as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection," including "determination of a minister's salary." *Skrzypczak*, 611 F.3d at 1246.  Accordingly, this dispute arises from "tangible employment actions" and is therefore "flatly bar[red]." *Brandenburg*, 2021 WL 2206486, at *4 (including "deciding compensation" within the set of barred claims); *Fratello*, 863 F.3d at 202–03.

A flexible test would concur.  As Judge Posner explained, a court applying the FLSA to "a minister" would inevitably entertain "arguments [that] would plunge a court deep into religious controversy and church management"—such as whether a "vow[] of poverty [was] passé" or whether the facilitating of alms was commercial activity.  *Schleicher*, 518 F.3d at 476–77.  So, he adopted "a presumption that clerical personnel" could not bring such claims, holding that the "ministers who administer[ed]" the "Salvation Army's Adult Rehabilitation Centers" performed labor with "a spiritual dimension." *Id.* at 477–78.  Those principles apply here.  The prosecution of an unpaid-wages claim by a chaplain who "counsel[ed] the families of patients in traumatic situations," would involve an undisputed spiritual dimension.  ECF No. 13 ¶ 72.  That

---

[9]    Plaintiff relies on a suite of cases involving employees who were not ministers, or employers who were not religious organizations.  ECF No. 30 at 17–18 (collecting cases).  Because the Court holds that Plaintiff was a minister for a religious organization within the meaning of the exception, those cases are inapposite.

is especially salient here, because Plaintiff's theory of the case rests on his compensation for shoulder time taken to minister to patients after the end of his shift. *Id.* ¶¶ 72, 76. And after *Hosanna-Tabor*, such a wage assessment would implicate the additional concern that it taxes the church's exclusive "authority to select and control who will minister to the faithful." 565 U.S. at 194–95. So even if the complaint implicates secular components—such as manipulating Plaintiff's timecard, *id.* ¶ 74—litigating an FLSA claim would force this Court to judge the value of pastoral work and interfere with a ministerial chaplaincy program.

*Tony & Susan Alamo Foundation v. Secretary of Labor*, a pre-*Hosanna-Tabor* case which Plaintiff cites, confirms the Court's position. There, the Supreme Court held that the FLSA did not violate the First Amendment as applied to Salvation Army associates who operated "service stations, retail clothing and grocery outlets, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and" a candy company. 471 U.S. 290, 292 (1985). It reasoned that the FLSA did not exempt such "commercial activities undertaken with a 'business purpose' and would therefore have no impact on" the Salvation Army's "evangelical activities." *Id.* at 305.

The division between commercial and ministerial work decides this case. While selecting cooks in the hospital cafeteria might not fall within the ambit of the ministerial exception, selecting chaplains who engage in ministry involves sensitive issues of internal governance that trigger the Free Exercise and Establishment Clauses. Plaintiff, who sues to recover the remuneration for his chaplaincy, falls on the latter side of the line—the side governed by Judge Posner's reasoning in *Schleicher*. Plaintiff's other authorities either involve a separate exception, *see, e.g.*, *Puri v. Khalsa*, 844 F.3d 1152, 1159 (9th Cir. 2017) (ecclesiastical

abstention), or non-ministerial employees, *see, e.g.*, *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1396–97 (4th Cir. 1990). Neither wins the day here.

### IV.    The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's State Law Claims.

When a court has original jurisdiction—such as federal question jurisdiction—over one claim in a lawsuit, it may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). But the Court "may decline to exercise supplemental jurisdiction" when it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). "[T]he elimination of federal-law claims prior to trial generally points to declining to exercise supplemental jurisdiction"—but "this principle 'does not establish a mandatory rule to be applied inflexibly in all cases.'" *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 86 (2d Cir. 2018) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)) (vacating order declining to exercise supplemental jurisdiction a week before trial).

The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Since this case has progressed only to the motion to dismiss stage, the normal presumption against supplemental jurisdiction applies. *See Onibokun v. Chandler*, 749 F. App'x 65, 67 (2d Cir. 2019) ("find[ing] no abuse of discretion" in declining supplemental jurisdiction at motion to dismiss stage); *Badwal v. Badwal*, 756 F. App'x 101, 103 (2d Cir. 2019) (finding no abuse of discretion at motion to dismiss stage in case involving *pro se* plaintiff). Given the incipient nature of this action, the Court declines to assert jurisdiction over the remaining state law claims.

### V.    The Court Denies Leave to Further Amend.

"A district court has broad discretion in determining whether to grant leave to amend[.]" *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000). While a district court cannot deny leave

21

to amend "without any justifying reason," the Court "has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200–01 (2d Cir. 2007).

The Court denies leave to file a second amended complaint. While courts "freely give leave" to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), Plaintiff does not identify any allegations that would disprove that EHS operated an Episcopalian hospital, that Plaintiff served as a minister, or that he suffered additional adverse actions not involving tangible employment actions. Such a "bare request to amend a pleading," unadorned with proposed changes, does not warrant another cut at the complaint. *Koehler v. Metro. Transp. Auth.*, 214 F. Supp. 3d 171, 178 (E.D.N.Y. 2016); *Potente v. Citibank, N.A.*, 282 F. Supp. 3d 538, 548 (E.D.N.Y. 2017). It is true: Plaintiff might present a Title IX hostile work environment claim, which at least some courts of appeals find fall outside the ambit of the ministerial exception. *Brandenburg*, 2023 WL 2185827, at *8. But he abandoned that theory during the proceedings at bar, so the Court declines to permit Plaintiff to revive it in this manner.

\*            \*            \*

## <u>CONCLUSION</u>

For the foregoing reasons, the motion to dismiss is GRANTED, and the complaint is DIMISSED.  The federal claims are dismissed with prejudice for failure to state a claim on which relief can be granted, and the state-law claims are dismissed without prejudice for lack of supplemental jurisdiction.  Plaintiff's motion to certify the case as a collective action under the FLSA is DENIED as moot.  The Clerk of Court is respectfully directed to enter judgment and close this case.

*/s/ Hector Gonzalez*
   HECTOR GONZALEZ
   United States District Judge

Dated: Brooklyn, New York
     February 5, 2026